| 194    475|
| 28 SC  451|

Charles Dreifus, Leopold E. Block and Emanuel Dreifus, trading as Dreifus, Block & Co., v. Columbian Exposition Salvage Company, Appellant.

*Contract—Rescission—New contract—Consideration.*

The mutual unexecuted undertakings of an existing contract are a sufficient consideration for the cancelation of such a contract and the substitution of a new one with different terms ; and it is immaterial if, for a moment during the interval, there is technically a breach of the old agreement, since by the new agreement both parties treat the old one as an existing contract, and mutually agree to a rescission of it.

Where one of two parties to a written contract fails in his obligation to deliver merchandise as provided by the contract, and the other party, desiring the merchandise, and not desiring a suit for damages, agrees to accept a fixed quantity and quality of merchandise, at fixed times and prices, different from those of the original contract, the old contract will be deemed to have been canceled by the parties, and the new contract will be held to be based upon sufficient consideration.

Argued Jan. 2, 1900.   Appeal, No. 417, Jan. T., 1898, by defendant, from order of C. P. No. 1, Phila. Co., dismissing exceptions to referee's report.   Before GREEN, C. J., McCOLLUM, MITCHELL, DEAN, FELL, BROWN and MESTREZAT, JJ.   Reversed.

Exceptions to referee's report.

The referee, E. Hunn Hanson, Esq., in his report, stated the facts as follows :

The action was foreign attachment in assumpsit.

The plaintiffs' statement filed claims to recover $6,600 with interest from November 23, 1895, and alleges that on February 9, 1895, the plaintiffs and defendant made a contract whereby the latter sold and agreed to deliver to the former 1,000 tons of melting stock from the World's Fair buildings in Chicago, sheared in lengths of six feet and under at $7.50 per ton f. o. b. cars Pennsylvania Railroad, Chicago, deliveries to be made in March, April and May.   On February 12, 1895, the plaintiffs and defendant made another contract by which the latter sold and agreed to deliver 2,000 tons of melting stock at the same price

and upon the same conditions as those mentioned in the contract first made, excepting that the defendant was entitled to deliver the last 1,000 tons during June, 1895. Pursuant to these contracts the defendant, up to July 6, 1895, delivered 819 tons ; on the date last mentioned the plaintiffs agreed to extend the time for the delivery of the rest of the melting stock to September 1, 1895, the defendant to deliver from forty to seventy tons a day. From July 6, to September 1, 1895, the defendant delivered 481 tons, from September 1 to Nov. 21, 1895, defendant delivered 1,100 tons, making in all 2,400 tons, leaving 600 tons undelivered. Of the 1,100 tons mentioned 900 tons were unsheared and consisted of pieces from ten to thirty feet long and are worth $4.00 a ton less than if they had been sheared according to contract, and thereby there was a loss to the plaintiffs of $3,600 in addition to which the plaintiffs suffered a loss of $3,000 by reason of the nondelivery of 600 tons. The average market price from July 6, 1895, to November 21, 1895, was $5.00 a ton more than the defendant had agreed to sell and deliver, making a total loss of $6,600.

The defendant company by its treasurer, August Pollock, made and filed an affidavit of defense. It admitted the two contracts alleged, and denied that only 819 tons were delivered prior to July 6, 1895 ; it denied there was an extension of time for delivery to September 1, 1895, or that the defendant agreed to deliver from forty to seventy tons a day. It further denied that the amount of said material delivered between July 6 and September 1, 1895, was 481 tons. And for further defense the defendant averred that on or about September 12, 1895, a contract was made between the plaintiffs and defendant whereby all existing contracts were then canceled, and in lieu thereof the plaintiffs agreed to accept 200 tons of steel scrap six feet and under, and 900 tons in the shape the defendant brings it to their shears ; in all other respects the same provisions shall exist as were a part of the canceled contracts ; that said contract was performed by the defendant company, but that the plaintiff refused to accept and pay for the last forty-eight tons sent them, and that the defendant sold the same at the market price at a loss of $2.00 a ton, a total loss of $96.00, for which sum the defendant claims judgment against the plaintiffs together with interest and costs.

The defendant pleaded nonassumpsit, set-off and payment with leave, etc.

The defendant's claim for $96.00 was withdrawn on the ground that it could be better determined in another action which is pending between the parties.

The issue is sufficiently indicated from the statement of claim and affidavit of defense.

The following are found to be the facts established by the evidence and they are all that are material and relevant to the issue:

1. On February 8, 1895, the defendant company, by August Pollock, its treasurer, wrote to the plaintiffs as follows:

"COLUMBIAN EXPOSITION SALVAGE CO.

"CHICAGO, February 8, 1895.

"MESSRS. DREIFUS, BLOCK & CO.,

"Pittsburg.

"Gentlemen: We offer you 1000 tons of melting stock from World's Fair buildings sheared in lengths of six feet and under at $7.50 gro. ton, f. o. b. cars Pa. R. R. Chicago, delivery March, April and May in such quantities as we can get ready, with understanding that freight is to be shipped to points taking Pittsburg rates or higher, and we get expense bills for making the claim for drayage rebate for our benefit. Option until February 9, 4 P. M.

"Yours,

"COLUMBIAN EX. SALVAGE CO.,

"per AUG. POLLOCK, Treas."

The following is a copy of plaintiffs' letter in reply:

"February 9, 1895.

"COLUMBIAN EXPOSITION SALVAGE CO.,

"Chicago.

"Gentlemen: We accept your proposition of February 8th to furnish us 1000 tons of melting steel at $7.50 gro. ton delivered and terms mentioned by you. Will honor your drafts at thirty days with documents attached.

"Yours, etc.,

"DREIFUS, BLOCK & CO."

On February 12, 1895, the defendant company wrote the plaintiffs a letter in these words:

"COLUMBIAN EXPOSITION SALVAGE CO.

"2-12-1895.

"MESSRS. DREIFUS, BLOCK & CO.,

"Lewis Block, Pittsburg, Pa.

"Gentlemen : We herewith offer you 2000 tons of structural steel from World's Fair buildings at $7.50 per gross ton f. o. b. cars Penna. track, Chicago, Ill., upon exactly the same terms and conditions as the one thousand tons sold you on the 9th inst.   However we reserve the privilege to make delivery of the last thousand tons during June, 1895, if we cannot get it out any sooner.

"Yours, etc.,

"COLUMBIAN EXPOSITION SALVAGE CO.,

"AUG. POLLOCK, Treas.

This offer was accepted by Dreifus, Block & Company.

Pursuant to the two contracts thus made the defendant company delivered to the plaintiff on

| | | |
|---|---|---|
| February, 1895, | . . . . . . | 43 tons. |
| March, " | . . . . . . . | 51 " |
| April, " | . . . . . . . | 44 " |
| May, " | . . . . . . . | 239 " |
| June, " | . . . . . . | 348 " |

2. The treasurer of the defendant company prior to July 3, 1895, advised the plaintiffs of the breakdown of the company's shears as a reason for not delivering more of the steel scrap ; and on that date in a letter he complained to the plaintiffs that they had failed to send him the expense bills (a subject of the contracts) adding that unless the bills were forwarded no further shipments would be made.   On July 6, 1895, the plaintiffs replied that they were urging the Carnegie Steel Company for these bills and hoped to send them during the then coming week. The plaintiffs in this reply requested the defendant company to forward the material still due on the contract as fast as possible ; and the treasurer of the defendant company undertook to deliver from forty to seventy tons a day, if the shears did not further break down.

Accordingly the defendant company delivered to the plaintiffs in July, 1895, 464 tons, and up to August 7, 1895, 108 tons, making, with that hitherto mentioned as delivered, 1,297 tons

of sheared steel scrap or melting stock, and leaving undelivered 1,703 tons.

3. The subject of the contracts was the iron and steel beams, trusses, pillars and plates used in the construction of the buildings erected for the Columbian Exposition at Chicago in 1893, twisted and warped by the heat of the fire which had destroyed them. Before this material could be cut into pieces of six feet length and under, ready for melting, much of it had to be separated from that to which it was attached by unriveting. The defendant company had shears intended to cut the material into the designated lengths, but, owing in great part to their erection upon made ground which yielded under the weight and strain of their working, they broke down several times in the summer of 1895. Both in Chicago and in Pittsburg there existed shears adequate to the work required in cutting this material.

Between August, 1895, and the following July, the defendant company sold and delivered about 3,000 tons of the sheared steel scrap to its treasurer and an equal quantity to the Illinois Steel Company. In July, 1896, the defendant company ceased shearing the 24,000 tons of structural material which it had got from the exposition.

4. After the contracts above mentioned the plaintiffs contracted to deliver to the Carnegie Steel Works that which they had so contracted to buy from the defendant. By reason of the nondelivery by the defendant to the plaintiffs of 600 tons, the latter were required to buy and did buy from others that number of tons to comply with their contract of sale aforesaid with the Carnegie Steel Works, and paid " approximately " $6.00 a ton more for it than the price stipulated between the plaintiffs and defendant. The market price of the sheared steel scrap or melting stock began to advance in the spring of 1895; by June 1 it was seventy-five cents a ton higher than the price the plaintiffs had agreed to pay the defendant; on July 6 it was $1.50 higher, and gradually advancing from that time it was double the said contract price before the middle of September. After that date the market price gradually declined, but no testimony was given of its extent.

5. On August 10, 1895, Block, one of the plaintiffs, went to Chicago from Pittsburg to obtain further delivery of the

melting stock.  He saw Pollock, the treasurer of the defend-
ant company, who said the company had such trouble with its
shears that it was unable to shear the structural material, and
advised the plaintiffs to accept instead of what was due an
equal quantity of unsheared material, and if this were done
fifty cents a ton for shearing would be allowed the plaintiffs.
Block at first insisted upon compliance with the terms of the
contract; finally he said if it were possible the plaintiffs would
take the unsheared, and on his return to Pittsburg he would
inform Pollock.

On his return to Pittsburg, and on August 14, he saw some
one on behalf of the Carnegie Steel Company, and asked if it
would receive the unsheared material.  This company, how-
ever, insisted upon having the material as the plaintiffs had
sold it, and as they (the plaintiffs) had bought it from the
defendant company; of this Pollock was at once notified, and
on August 17 he renewed the offer to deliver the material un-
sheared, which offer the plaintiffs did not accept.

On September 11, 1895, Block went to Chicago, again saw
Pollock and urged that delivery be made; the latter said the
matter was out of his hand, and invited Block to meet his as-
sociates in the company.  This he did in the afternoon of that
day.  At the meeting, Levine, the president of the defendant
company, told him that the company would not deliver the
plaintiffs another pound of the material and that he supposed
Block thought him a robber and a thief.  The interview lasted
some hours; Block represented that such a course was robbing
the plaintiffs of from $6,000 to $7,000, and threatened suit.
Levine said the company would wind up as soon as all the
structural material was delivered and he was therefore indiffer-
ent to a suit; Block continued to plead and he was put in
communication with Harris, one of the directors; Harris said
it was useless for him to behave as he was doing; that the
plaintiffs' " order " (obviously meaning the February contract)
was canceled, and had been since August, when they declined
to accept the offer of unsheared steel scrap.  Apparently Block
prevailed by his much speaking, for Harris offered 200 tons of
sheared, and 900 tons of unsheared scrap as brought to the
shears.  This Block accepted; he returned to Pittsburg and
sought legal advice with respect to the effect of this offer and

its acceptance upon the February contract, and, although it is not otherwise in evidence, it was admitted by the attorney who gave it that he advised that there was no consideration for a cancelation of the contract of February, and such cancelation, therefore, would be legally voidable.   Thereafter the following correspondence between the defendant company and the plaintiffs took place, intended to express and expressing the arrangement aforesaid in Chicago of September 11:

"CHICAGO, September 12th, 1895.
"MESSRS. DREIFUS, BLOCK & CO.,
            "Pittsburg, Pa.

"Gentlemen: In accordance with agreement between the writer and your Mr. L. E. Block, the various contracts between you and this company are canceled and you agree to accept in lieu thereof 200 tons of steel scrap 6 feet and under and 900 tons of steel in shape as we bring them to our shears.   In all other respects such as to price, delivery, terms of payment, and return of expense bills, etc., the same provisions shall apply as in the contracts which are canceled.

"Please acknowledge receipt and oblige,
            "THE COLUMBIAN EXPOSITION SALVAGE CO.
                "per A. LEVINE, President."

"PITTSBURG, PA., September 13, 1895.
"THE COLUMBIAN EXPOSITION CO.,
            "Chicago, Ill.

"Gentlemen: Replying to your favor of the 12th same is satisfactory to us.   Please have all of this material shipped without any further delay.

"Yours respectfully,
            "DREIFUS, BLOCK & CO."

6. At the time of this correspondence the defendant had on hand 200 tons of steel scrap sheared.   It, as well as the 900 tons of steel (unsheared) mentioned in the letter of September 12, was a part of the mass of structural iron and steel from which the defendant company had in February agreed to deliver 3,000 tons to the plaintiff.

For the material delivered before September 12, as well as for that received subsequently the plaintiffs paid the contract price.

Pursuant to the letters of September 12–13, the defendant delivered to the plaintiffs between September 15 and 26, over 197 (say 198) of the 200 tons sheared. Of the 900 tons unsheared 762 tons were delivered between September 16 and November 13. On or about October 24, at the plaintiffs' request, the carriers to whom delivery in Chicago was to be made was changed to the Baltimore & Ohio railroad cars, Chicago. Between November 15 and 21, the defendant sent eight cars containing 104 tons to Pittsburg and it drew upon the plaintiffs two drafts representing the price of these tons, one for $485.15 and one for $295.64 accompanying them with bills of lading for the material. The plaintiffs declined to accept either draft, both were protested, and on November 25, 1895, the 104 tons were the subject of proceedings in foreign attachment in Pittsburg at the suit of the plaintiffs, which proceedings are still pending: thereupon the defendant company declined to forward 34 tons, unshipped part of the 900 tons.

The plaintiffs were in frequent correspondence with the defendant relative to carrying into effect the arrangement of September 12–13; they made no complaint that so much or any of the 900 tons unsheared were not "in shape as we bring them to our shears" until this suit and that in Pittsburg. Very much of the testimony, however, has been directed to that point. It is contradictory, as it is with respect to the cost of putting the material in shape for shearing, and the cost of cutting it into the required lengths. A careful consideration and reconsideration of it has developed the following: (*a*) of the 762 tons of unsheared material about sixty per centum was "in shape as we bring them to our shears," about forty per centum, or 304 tons, was not in such shape, and separation by unriveting (or unbuckling as it was more generally called) was necessary before it could be sheared. (*b*) The cost of separation by unriveting was $1.00 a ton. (*c*) The cost of shearing was fifty cents a ton. (*d*) The cost either in Chicago or Pittsburg of hauling to and from shears adequate for the work would be each way fifty cents, or $1.00 a ton.

The referee found for the plaintiffs in the sum of $5,114.06.

Exceptions to referee's report were dismissed by the court and judgment entered for $5,114.06. Defendant appealed.

*Errors assigned* were in dismissing exceptions to referee's report.

*Thomas Leaming,* for appellant.—If the referee was correct in finding a breach in the conversation which terminated in cancelation, then the breach converted the plaintiffs' former rights into a claim for money. But plaintiffs then preferred to accept merchandise. This was a good contract.

The referee's position is fallacious, because the claims of the parties at the date of the alleged breach were unliquidated and doubtful in amount and, therefore, the proper subject of compromise, and, because a valid consideration existed for the agreement of September 12–13, namely, the undertaking to deliver a less quantity of material in a different stage of manufacture, at a later period and in changed market conditions, the rule, which precludes the satisfaction of a debt by payment of a smaller sum, being strictly confined to money alone: Mechanics' Bank v. Huston, 11 W. N. C. 389; Martin v. White, 40 Ill. App. Ct. Rep. 281; McNish v. Reynolds, 95 Pa. 483.

The referee's position is fallacious, because non constat that the defendant would not have fully performed the agreement of September 12–13, had not plaintiffs broken it by dishonoring drafts and seizing the steel by foreign attachment, without previous complaint, and before the entire completion of shipments.

The true construction of the whole transaction is that the parties made a settlement of their disputes, and reduced it to a contract in writing, which was acted upon for months. This was a good contract: Flegal v. Hoover, 156 Pa. 276; Ins. Co. v. Detwiler, 23 Ill. App. Ct. Rep. 656; Bishop v. Busse, 69 Ill. 403; Alschuler v. Schiff, 164 Ill. 298.

*Abraham Israel,* with him *Jacob Singer* and *Emanuel Furth,* for appellees.—By the alleged "new contract" or "release" defendant agreed to perform only part of what it was bound to do under the February contract, hence it contained no valuable consideration, and is, therefore, nudum pactum: Whitehill v. Wilson, 3 Penrose & Watts, 405; Kidder v. Kidder, 33 Pa. 268.

OPINION BY MR. JUSTICE DEAN, February 5, 1900:

This suit was begun by foreign attachment, and at the hearing the issue took the form of an action of assumpsit. The cause was sent for trial to E. Hunn Hanson, Esq., as referee, to find facts and apply to them his conclusions of law ; in effect, both his findings and conclusions are in favor of plaintiffs, and defendant appeals, alleging he erred in not finding for defendant and certifying a balance in its favor. The findings of fact are so full and so orderly stated by the learned referee, that it would be a useless labor to restate them at length in this opinion. Counsel for appellant accepts as true all the material facts of the referee approved by the court below, but he assigns for error the referee's conclusions from them.

Briefly stated, defendant, in February, 1895, contracted to deliver f. o. b. cars at Chicago, for shipment to Pittsburg, 3,000 tons of sheared steel at $7.50 per ton, the deliveries to be completed by June 30 following, to be paid for in plaintiffs' thirty day drafts when delivered. At the expiration of the time, neither party had performed to the letter, the contract ; shipments continued during the summer, but defendant, alleging a breakdown of its machinery for shearing the steel, made no shipments after the 7th of August, and on the 10th of that month notified plaintiffs that it was impossible to ship sheared steel as provided by the contract. By this time the steel had largely advanced in price over the contract figure ; had very nearly doubled. It is not improbable, as plaintiffs allege, that defendant sought to evade its contract obligation ; and it is too plain for argument that plaintiffs wanted the steel and did not want a suit against defendant for damages ; so, on September 11, L. E. Block, a member of the plaintiff partnership, met Levine, president of defendant company in Chicago ; much anger was displayed by both, and suits were threatened, but the interview ended in the making of a new contract, by which the old one was canceled, and the new one, materially modifying and changing the terms of the old, was agreed upon. The terms of the new one are expressly set out in the two letters of the 12th and 13th of September, one and two days after the interview between Block and Levine. These are the letters :

"CHICAGO, September 12th, 1895.

"MESSRS. DREIFUS, BLOCK & CO.,

"Pittsburg, Pa.

"Gentlemen: In accordance with agreement between the writer and your Mr. L. E. Block, the various contracts between you and this company are canceled and you agree to accept in lieu thereof 200 tons of steel scrap 6 feet and under and 900 tons of steel in shape as we bring them to our shears. In all other respects such as to price, delivery, terms of payment, and return of expense bills, etc., the same provisions shall apply as in the contracts which are canceled. Please acknowledge receipt and oblige,

"THE COLUMBIAN EXPOSITION SALVAGE CO.
"per A. LEVINE, President."

"PITTSBURG, PA., September 13, 1895.

"THE COLUMBIAN EXPOSITION CO.,

"Chicago, Ill.

"Gentlemen: Replying to your favor of the 12th same is satisfactory to us. Please have all of this material shipped without further delay.

"Yours respectfully,
"DREIFUS, BLOCK & CO."

Shipments continued under this new contract for months when plaintiffs seized by foreign attachment 104 tons of steel shipped by defendant to Pittsburg, and refused payment of the drafts therefor; then this suit was commenced in Philadelphia by plaintiffs to recover damages for the breach of the old contract. The referee finds thus:

"The letters of September 12–13 exhibit in the clearest way that it was the expressed purpose of the parties to end their rights under the contract of February 8, 9, 12, and in place of them, to substitute the September agreement."

But on this established fact, the referee concludes thus: " . . . . There was no valuable consideration for the agreement. Since the plaintiffs invoke the strict legal principle, it is decided that after the breach of the February contracts, there could be neither the substitution of another, nor its cancelation, neither its release nor discharge without a valuable consideration for it."

Hence his finding for the plaintiffs. He states the general rule of law correctly, when he says:

" It is true that even after a breach of contract, a debtor, by paying to his creditor but a part of his debt, may have a valid discharge of all, if there was doubt as to the amount due, or if that which was due is unliquidated, but not otherwise. . . .

" In this case the debt was capable of exact ascertainment by calculation . . . . and that which was due was not unliquidated."

The opinion of a lawyer, of the learning and ability of the referee, has moved us to a careful revision and consideration of his report; after the most mature deliberation, we are clearly of the opinion he erred in his application of the law to the facts found by him. Assume, as he does, that at the personal interview between Block and Levine on the 11th of September, there was a distinct declaration by the latter that his company would not perform its contract; still if anything can be clear, it is, that above all things, plaintiffs did not want a lawsuit for damages ; at that stage, their damages were wholly uncertain, depending on the fluctuating price of steel; they did know they wanted the steel; what damages they might want by reason of defendant's breach, or what they might sustain, they did not know. In this dilemma, they sought for and obtained a new contract expressly canceling the old. They did not accept a less sum than the money due on a debt certain in amount, a contract which under the authorities would have been without consideration; they agreed to accept a fixed quantity and quality of merchandise at fixed times and prices, instead of the uncertain event of a lawsuit. It in no way changes the character of the contract of September 11, 1895, that, now, long after the event, the referee, can under the terms of the old contract, to his satisfaction, with approximate certainty, liquidate the damages occasioned by the breach. How did matters stand, then, with the uncertainty of the steel market on that day ? That was the question in contemplation of both parties. In McNish v. Reynolds, 95 Pa. 483, we held, " that the mutual, unexecuted undertakings of an existing contract are a sufficient consideration for the cancelation of such a contract, and the substitution of a new one with different terms." It is immaterial, if, for a moment during the interview, there was technically a breach by defendant; by the new agreement, both treated the old one as an existing contract, and mutually agreed to a rescission of it.

And even taking the most rigid statement of the rule invoked by the referee, that rule reaches no further than stated by SHARSWOOD, C. J., in Bank v. Huston, 11 W. N. C. 389:

" It may be considered now well settled in this state, that payment of a part of an undisputed debt after it is due, though accepted in full, is not a good accord and satisfaction. While this is so, it is equally well settled, that the acceptance of a collateral thing, without regard to its value, is a good accord and satisfaction. In the absence of fraud, the courts never inquire into the adequacy of the consideration of an agreement."

Assuming that the damages could have been liquidated with certainty at that date, plaintiffs condoned all the wrong defendant threatened, and accepted as full satisfaction, certain merchandise, a collateral thing, steel of a different size, unsheared scrap, at a different price, instead of insisting on payment in money of the sum certain. In Flegal v. Hoover, Hughes & Co. 156 Pa. 276, involving a contract which in all its material features resembles the one before us, our Brother MITCHELL, speaking for the Court, says:

" The parties then came together, agreed upon a settlement, put its terms in writing, which was signed by both, and partly carried out. Such an agreement is not an accord, but a compromise, and is as binding as any other contract. But it was not necessary to the validity of the agreement of May, 1892, that there should have been even a compromise of disputed rights. The parties to a contract may at any time rescind it, either in whole or in part, by mutual consent, and the surrender of their mutual rights is sufficient consideration. That is what the parties did in the present case, and their rights must be determined exclusively by the agreement of May, 1892. . . . The parties have made a final adjustment of all these matters, and the original contract of 1891 is of no further efficacy except as a guide in determining how much was due under it for the logs and bark mentioned in the agreement of 1892."

The learned referee holds that this contract must be determined by the lex loci, the law of Illinois, but there is no substantial conflict between the law of that state and this, as will be seen by reference to Martin v. White, 40 Ill. App. Ct. Rep. 281, and Bishop v. Busse, 69 Ill. 403. In Insurance Co. v. Detwiler, 23 Ill. App. Ct. Rep. 656, the court says:

"The term 'cancelation' of a contract necessarily implies a waiver of all rights thereunder by the parties. If after breach by one of the parties, they agreed to 'cancel' it and make a new contract with reference to its subject-matter, that is a waiver of any cause of action growing out of the original breach, and this is the rule even though the original contract was under seal."

As to the attachment proceedings on the 104 tons of iron in Pittsburg, delivered on the second contract, we think, as the court there had jurisdiction before suit was entered here on the old contract for damages, it is best that that court should retain jurisdiction in that matter until final judgment. It would not be conducive to orderly litigation to import that question into this issue.

But for the reasons given, the judgment of the court below in this case is reversed, and judgment is entered for defendant.