Goodbody et al., Appellants, *v.* Margiotti.

Argued January 27, 1936; reargued April 22, 1936. Before Kephart, C. J., Schaffer, Maxey, Drew, Linn, Stern and Barnes, JJ.

*William H. Eckert,* with him *John G. Buchanan,* of *Smith, Buchanan, Scott & Gordon* and *William L. Glenn,* for appellants.

*Sebastian C. Pugliese,* with him *James H. Duff* and *John E. Evans, Sr.,* for appellee.

OPINION BY MR. JUSTICE STERN, October 5, 1936:

On June 25, 1931, defendant opened an account with plaintiffs, depositing $2,500 as margin. Various stocks were bought and sold for the account, resulting in a profit to defendant. On July 6 all the stocks in the account had been sold and there was a cash credit to defendant amounting to $3,505.51. On July 6 and 7 plaintiffs purchased for defendant upon his orders 500 shares of Radio Corporation, 500 shares International Telephone & Telegraph, and 500 shares American Foreign Power. After these transactions the balance due by defendant to plaintiffs was $45,019.49.

In the afternoon of July 7; Condon, the representative of plaintiffs with whom defendant had been dealing, told him over the telephone that the market had dropped

considerably on that day. Defendant, as he alleges, instructed Condon to sell all the stocks in the account at the opening of the market the next morning, and said he would send a check for whatever debit balance would result. The market opened still lower on the morning of July 8, and continued to fall during that day. After the close of the market on July 8 Condon, according to defendant's version, telephoned to him and told him of the increased loss that had occurred, and stated he had not executed defendant's order to sell out the securities because he thought the drop in the market was only a temporary flurry. Defendant rebuked Condon and said that if the order to sell had been carried out the loss would have been less, that the loss up until the opening of the market that morning was his own, but the subsequent loss was plaintiffs'. Defendant claims that Condon assented to this and made an offer to defendant that if the latter would withdraw his order to sell the securities and let the account run on, plaintiffs would carry it without requiring further margin until such time as the market came back, and plaintiffs would handle it in such a way that neither of the parties would have any loss. Defendant agreed to this arrangement.

Condon denies that defendant on July 7 gave an order to sell the stocks the following morning, or that any agreement was made on July 8 as asserted by defendant.

Had the securities been sold when the market opened on July 8, the debit balance due by defendant to plaintiffs would have been $2,671.66; between then and the close of the day the further decline in the value of the stocks amounted to about $2,000. After July 8 the market dropped more or less steadily. During the period from August until December, 1931, plaintiffs bought and sold for the account various stocks; they assert this was done in pursuance of orders given by defendant from time to time, and that they sent to him confirmations of these purchases and sales and also monthly statements of the account. Defendant claims he did not order any

purchases or sales of additional securities after July 7, that he repudiated these transactions, and that he made objection to Condon in regard to the statements of account, but Condon constantly reassured him by telling him the agreement of July 8 was in full force and effect between the parties, and the confirmations and statements were rendered only as a matter of form. Defendant asserts that Condon's authority was orally confirmed by one of the partners of plaintiffs' firm, who also expressly ratified the arrangement made by Condon. Condon and the partner in question deny these allegations.

Since defendant failed to margin the account as repeatedly demanded by plaintiffs, the latter sold out the last of the securities on March 14, 1932; the result was a debit balance from defendant to plaintiffs of $32,-601.12, to recover which sum, with interest from that date, plaintiffs brought the present suit. Defendant, relying upon the alleged agreement of July 8, 1931, which in effect guaranteed him against any loss, not only denied all liability to plaintiffs, but set up a counterclaim to recover the $2,500 deposited by him in opening the account. The jury found for defendant and awarded him a verdict of $3,018.38, being the amount of the counterclaim with interest. Plaintiffs filed a motion for judgment n. o. v., which was overruled by the court below, and a rule for a new trial, which was discharged upon defendant's filing a remittitur of the verdict in his favor on the counterclaim.

The record of the trial is extremely voluminous, due to the fact that a large part of the testimony was irrelevant to the real issues between the parties, and another large part, though perhaps technically admissible, was unnecessary and probably confusing rather than helpful to the jury in their consideration of the case.

Although neither in the pleadings nor at the trial did either of the parties contend that the transactions between them were unlawful, the court below, in its opinion, came to the conclusion that the account represented

merely a wagering contract designed for an ultimate settlement between the parties on the basis of market differences and without any bona fide intent that the securities should actually be bought and sold. The court therefore held that neither party could recover from the other, and for this reason defendant should remit the verdict in his favor for the amount of the counterclaim. While, for reasons hereinafter stated, defendant cannot recover his counterclaim on any proper theory of the case, the court was in error in concluding that the account was other than a legitimate one between broker and customer. Not only were all of the stocks in fact bought and sold, but there is not a scintilla of evidence that either party had any intent to the contrary. That the securities traded in may have been speculative, that the account was carried on margin, and that defendant's intention no doubt was to buy and sell the stocks as opportunity for profit arose rather than to hold them for any extended period of time as investments, are not factors which, either singly or collectively, invalidated the transactions: *Stewart v. Parnell*, 147 Pa. 523; *Peters v. Grim*, 149 Pa. 163; *Hopkins v. O'Kane*, 169 Pa. 478; *L. H. Taylor & Co.'s Assigned Estate*, 192 Pa. 304; *Young, Smyth, Field & Co. v. Glendinning*, 194 Pa. 550; *Fearon v. Little*, 227 Pa. 348.

Plaintiffs contend that even if, as defendant asserts, he ordered them on July 7 to sell the securities, they were not legally bound to execute the order, there being then a deficit in the account, and they had the right to exercise their own judgment in regard to disposition of the collateral. Without passing upon this question, it is sufficient to say that according to defendant's testimony plaintiffs did not refuse to accept the selling order on that ground or any other, and, while defendant apparently does not claim that Condon expressly agreed to sell the stocks, a jury might be permitted to infer, from the account of the conversation as given by defendant, that Condon at least impliedly assented and gave

defendant reason to feel assured the order would be carried out. Under such circumstances plaintiffs were obliged to make the sale, and upon their failure to do so they became liable to defendant for whatever damages were suffered by him. Assuming, therefore, as we must for purpose of this review, that defendant's version of the facts is the correct one, he was justified in taking the position, as he did in his telephone conversation with Condon on July 8, that the loss up to the opening of the market on that day was his own, but all subsequent loss was plaintiffs'. It is our opinion, however, that the alleged agreement of July 8 was a nudum pactum because it was not supported by consideration. There may have been a motive for plaintiffs to have made it, as, for example, the desire to please a customer, but it is consideration and not motive that is necessary to support a contract. Defendant urges that the consideration consisted in his willingness not to insist upon the carrying out of the sale order, and his waiver of the right to claim damages. The order, however, had expired; plaintiffs had defaulted in executing it, creating in defendant a right to recover compensation for the breach. An analysis of the situation indicates that the waiver of this right would not serve as a consideration for the contract which plaintiffs are alleged to have made. As the market stood at the opening on July 8 defendant had lost his original deposit of $2,500 and an additional sum of $2,671.66, or a total of $5,171.66. All that plaintiffs gained by the arrangement was that defendant agreed not to hold them responsible for the additional loss of $2,000 which had resulted during the day. In return for this, according to defendant, plaintiffs agreed to relieve him of the loss theretofore incurred by him of $5,171.66, to assume the loss of $2,000 from which he claimed to be exempting them, and to make themselves responsible for any future loss that might occur; on the other hand, all profits were to belong to defendant. In other words, so far from plaintiffs' receiving the benefit of a waiver of

damages, they not only, by their guarantee against all loss, reassumed liability for the damages which defendant was "waiving," but undertook to indemnify him against all past losses and possible future ones. Moreover, it is obvious that the alleged opportunity given to plaintiffs to work out the situation by buying and selling securities in defendant's account but on their own responsibility cannot be deemed to constitute a consideration to plaintiffs, since in any event they could have speculated in securities on their own account and did not need any permission from defendant to that end. In short, mere arithmetic establishes that the alleged consideration for plaintiffs' guarantee was not a detriment to defendant nor a benefit to plaintiffs.

The agreement of July 8, as pleaded and testified to, was therefore unenforceable, and did not, from a *substantive* standpoint, affect the rights or obligations of the parties; it did not deprive defendant of his right to claim damages nor did it make plaintiffs insurers to defendant against loss on the account. It must be added, however, that the testimony of both parties in regard to it was properly admitted as *evidence* bearing upon the subsequent relations and transactions between the parties; whether such an agreement was in fact made is extremely important as determining the controverted facts which are the real issues between the parties as hereinafter pointed out.

From an analysis of the facts, even if defendant's version be correct, it is clear that although plaintiffs may have been at fault in not carrying out the alleged sale order of July 7, this would not disentitle them to recover at least the sum of $2,671.66 which defendant would have owed them even had the order been executed. Defendant cannot by plaintiffs' default put himself into a more advantageous position than he would have occupied had the default not occurred. The only penalty plaintiffs would be obliged to suffer by reason of their breach would be the loss occurring to defendant by rea-

son thereof *after* the opening of the market on July 8. Plaintiffs occupied toward defendant a double relationship—that of agent and principal *(Robinson v. Ungerleider,* 313 Pa. 301), and that of creditor-pledgee and debtor-pledgor *(Otis v. Medoff,* 311 Pa. 62). In the latter capacity defendant owed plaintiffs, on the morning of July 8, $45,019.49, for which the securities were held as collateral. If as agents they failed to carry out an order of defendant, he became entitled to set off against the advances which had been made by plaintiffs for his account a sum equal to the damage suffered by him through their default, but they did not thereby lose the right to recover anything at all from defendant. Even if a broker converts a customer's securities and thus breaches his duty as pledgee, the customer can do no more than offset against the broker's claim for advances and commissions the damages resulting by reason of such conversion: *Otis v. Medoff,* supra. Since the agreement of July 8 did not, for the reasons stated, impose any obligation upon plaintiffs to indemnify defendant against all loss, defendant in any event would be liable to plaintiffs for the sum of $2,671.66; for the same reasons he cannot recover the $2,500 originally deposited by him as margin and which had been lost by him prior to the morning of July 8.

The ultimate issues of fact which will have to be determined at a re-trial are these: (1) Did the defendant order his account sold on July 7 as claimed by him, and did Condon impliedly accept the order? If so, defendant would not be responsible for any loss caused by the retention after the morning of July 8 of the securities which were then in the account. (2) Were the securities which were purchased and sold after July 8, or any of them, purchased and sold upon orders of defendant or at plaintiffs' own risk and without authority from defendant? If the latter, then he cannot be held responsible for losses resulting in the account from such additional purchases and sales as were made without his au-

thorization. (3) Were the monthly statements of accounts objected to by defendant, or were they received by him under such circumstances of express or tacit acquiescence as would give to them the legal effect of accounts stated? If the latter, defendant would be estopped from denying the liability asserted by plaintiffs in such statements.

As the case goes back for a re-trial, probably most of the questions raised by the assignments of error will not again occur, and therefore do not need present discussion. However, some of them may be briefly referred to.

Plaintiffs contend the record discloses that neither Condon nor John L. Goodbody had authority to make the alleged agreement of July 8 so as to obligate plaintiffs thereby, and it should have been so declared as a matter of law. In view of the fact that we have held that the agreement did not bind plaintiffs because of lack of consideration, the question of the authority to make it becomes academic.

The court below permitted an extensive cross-examination of plaintiffs' witness Condon upon matters as to which he did not testify in chief and which really constituted the gist of defendant's case. While the latitude to be allowed in cross-examination is largely within the discretion of the court, it should not be permitted to a point where the orderly sequence of the trial is disturbed and an unfair disadvantage imposed upon the other party: *Hughes v. Westmoreland Coal Co.,* 104 Pa. 207; *Thomas & Sons v. Loose, Seaman & Co.,* 114 Pa. 35; *Glenn v. Phila. & West Chester Traction Co.,* 206 Pa. 135.

Objection is made to the charge of the learned trial judge in stating to the jury that they might render a verdict for defendant in the amount of his counterclaim provided they found he had ordered the account sold out and plaintiffs had failed to execute the order. This was incorrect in view of what has already been said. We have pointed out that the failure of plaintiffs to execute

the sales order of July 7 would not prevent them from recovering at least the amount which would have been due them even if they had carried out the order.

The court below sustained objections to the admission of certain exhibits offered by plaintiffs, consisting of a letter written to defendant by one of the partners of plaintiffs' firm, and confirmations of open orders for defendant's account. Defendant did not admit having received these communications but plaintiffs testified to the mailing system employed by them, and the writer of the letter testified he had signed it and put it in course of mailing. It having been shown by plaintiffs that under their office routine these communications would have been mailed in regular course, and it having also been shown that although there was a return address on the back of the envelopes they were not sent back by the post office, the mailing of these exhibits was sufficiently proved to justify the introduction of copies in evidence, it becoming then a question for the jury to determine whether or not they were actually received by defendant.

Finally, plaintiffs urge it should not have been required of them by the learned trial judge to prove the purchases and sales of securities made after July 8, 1931, since the fact was not properly denied in the pleadings. The affidavit of defense, in answer to the paragraph of the statement of claim setting forth these purchases and sales, alleged that "Defendant further says that he has endeavored to ascertain whether or not such purchases and sales were actually made, but that it is impossible for him to obtain such information or verify such statements, and therefore, he denies the same." This was not a sufficient denial to make it obligatory upon plaintiffs to offer proof of the fact. The Act of June 12, 1931, P. L. 557, requires defendants to make a *reasonable* investigation and this must be alleged; nor does the amendatory Act of July 12, 1935, P. L. 666, make any change in this particular respect.

The order of the court below overruling plaintiffs' motion for judgment n. o. v. is affirmed, but the order mak-

ing absolute plaintiffs' rule for a new trial unless defendant file a remittitur is reversed, and plaintiffs' rule for a new trial is now made absolute unconditionally.

See, also, opinion sur petition for reargument, page 560a.

DISSENTING OPINION BY MR. JUSTICE MAXEY:

I dissent from the majority opinion. Its reversal of the court below is based on two propositions: (1) that "defendant relied upon the alleged agreement of July 8, 1931, which in effect guaranteed him against any loss," and (2) that this "alleged agreement was a nudum pactum because it was not supported by consideration." Both these propositions are, in my judgment, untenable. Defendant's *whole* reliance was not on that agreement.

Plaintiffs' claim is logically divided into two parts: (a) for losses arising from the decline in stocks which it bought at defendant's request *prior to July 8, 1931,* and (b) for losses arising from the decline in stocks which it bought on defendant's account *after that date.* In defense of (b), i. e., the latter portion of plaintiffs' claim, defendant offered testimony that purchases of these stocks were made without his authority. This raised an issue of fact. The majority opinion says that when this case is re-tried, one of the issues will be: "Were the securities which were purchased and sold after July 8th or any of them, purchased and sold upon orders of defendant or at plaintiffs' own risk and without authority from defendant?" That issue *was* submitted to the jury at the first trial and my attention has not been called to any error in the manner of its submission sufficiently substantial to justify a reversal.

In defense of (a), defendant pleaded the agreement of July 8th. Whether or not this agreement is a "nudum pactum" is entirely a question of law, and on that question I think the authorities do not support the majority opinion. I believe that in holding the agreement of July 8th a "nudum pactum" the majority opinion takes too

narrow a view of consideration. It says: "Mere arithmetic establishes that the alleged consideration for plaintiffs' guarantee was not a detriment to defendant nor a benefit to plaintiffs." There are considerations which constitute the vital element in contracts and yet which are not measurable by arithmetic. Consideration in contracts does not have to be expressed in dollars. The consideration in the contract of July 8th was not an arithmetical one. *Williston* in his new work on *Contracts* (revised edition), Vol. 1, sec. 102, says: "The requirement ordinarily stated for the sufficiency of consideration to support a promise is, in substance, a detriment incurred by the promisee or a benefit received by the promisor at the request of the promisor. . . . It would be a detriment to the promisee, in a legal sense, if he, at the request of the promisor and upon the strength of that promise, had performed any act which occasioned him the slightest trouble or inconvenience, and which he was not obliged to perform [citing cases]. Thus abstaining from smoking and drinking, though in fact in the particular case a benefit to the promisee's health, finances, and morals and of no benefit to the promisor is a legal detriment and if requested as such is sufficient consideration for a promise. . . . Detriment, therefore, as used in testing the sufficiency of consideration means legal detriment as distinguished from detriment in fact. It means giving up something which immediately prior thereto the promisee was privileged not to do or refrain from doing. . . . That the promisor desired it for his own advantage and had no previous right to it is enough to show that it was beneficial." In the agreement of July 8, 1931, (assuming such an agreement to have been entered into, and the jury so found, as under the evidence it had the right to do), we have *both* a benefit to the promisor (plaintiffs) and a detriment to the promisee (defendant).

The situation between the parties on July 8, 1931, was as follows: Plaintiffs possessed certain stock which they

had purchased for defendant. This stock was then worth $5,171.66 less than they had paid for it. Defendant had deposited $2,500 when he opened the account so that by his paying them $2,671.66 they would have suffered no loss by their dealings with him up to that time. This sum defendant presumably was able to pay. But by their failure to execute defendant's July 7th order (which he testified he gave them) to sell the stocks in question at the opening of the market on July 8th, the stocks had further depreciated in value about $2,000. This was a loss which would be visited upon plaintiffs if the stocks standing in defendant's name had then been "dumped on the market." Defendant was in a position to make plaintiffs do this. Had the transaction between plaintiffs and defendant ended then and there and the stock been sold, defendant would have "been out" a total of $5,171.66 (including his original "margin" of $2,500) and plaintiffs would have "been out" $2,000.

According to defendant's testimony, plaintiffs' representative, Condon, thought it would be better for *both plaintiffs and defendant* not to close out this account but to hold the stocks for an expected rise. Condon's proposition to defendant was in substance as follows: Withdraw your order to us to sell the securities and let the account run on; we will carry it without requiring further margin until such time as the market comes back. We will handle it in such a way that neither of us will have any loss. When defendant consented to that offer, plaintiffs were relieved of the necessity of paying $2,000 which their failure to sell the stocks on the morning of July 8th had obligated them to do if defendant had persisted in the carrying out of his order to sell. Had the stocks later returned to the value they had on the morning of July 8th and had then (after so returning to their former value) been sold, plaintiffs would have gained $2,000 by defendant's forbearance in withdrawing at the close of the market on July 8th his order to sell. What they actually gained by the agreement of July 8th was

relief from the necessity of then charging off against themselves a loss of $2,000. On July 8th it appeared to be in the interest of plaintiffs to have defendant enter into the agreement their agent proposed. The agreement was entered into; it was supported by a consideration, and was therefore not "nudum pactum." The consideration as to the promisors was the prospect, then apparently reasonable, of recovering in a market rise the loss of $2,000 resulting from the July 8th decline, by securing defendant's permission to let the account stand undisturbed. The majority opinion says: "It is obvious that the alleged opportunity given to plaintiffs to work out the situation by buying and selling securities in defendant's account but on their own responsibility cannot be deemed to constitute a consideration to plaintiffs, since in any event they could have speculated in securities on their own account and did not need any permission from defendant to that end." Reasons readily come to mind as to why plaintiffs would prefer to maintain the July 8th status quo of defendant's account with themselves as defendant's *agent* than become the *principals* themselves in respect to an identical account.

The consideration as to defendant was the detriment suffered by him in being put to the inconvenience and annoyance (as the event abundantly proved) of still carrying his margined account with the plaintiffs. A detriment sustained by a promisee at the request of a promisor will give rise to a legal liability. Defendant permitted the relationship of principal and agent to continue as between him and plaintiffs with all the risks that that relationship entailed. That the risk was a substantial one, the present litigation attests. If, for example, in the first instance plaintiffs had asked defendant's permission to buy stocks in the market *ostensibly* as *his* agent but *actually on plaintiff's own account,* and had promised some benefit to defendant in "consideration" of his granting that permission, there is no doubt that defendant's lending his name for that pur-

pose would have been a sufficient detriment or inconvenience to him to have made them liable to him for the benefits promised under the resulting contract. If A lends his name to B for any legitimate business purpose and B promises him compensation therefor, a valid contract arises from such facts. On the other hand, if B said to A, "I will speculate in the stock market *in my own name* and give you a share in my gains therefrom," A would have no recoverable claim against B no matter how great B's gains might be, for the agreement would be nudum pactum, A having by such arrangement been put to no inconvenience whatsoever and therefore sustained no detriment. In the instant case defendant could have said to plaintiffs: You pay your share of the loss up to date and I will pay mine, and then I will retire from the market and have no more annoyance from this transaction. At plaintiffs' request, so defendant testified, the latter refrained from doing this. This forbearance on his part supplied the necessary element of consideration.

*Williston on Contracts* (revised ed.), Vol. 1, sec. 103C, cites with approval the following quotation from *Finlay v. Swirsky*, 103 Conn. 624, 131 A. 420: "Consideration is defined as a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." *Williston*, in section 115, says: "It is an 'elementary principle that the law will not enter into an inquiry as to the adequacy of the consideration.' This rule is almost as old as the law of consideration itself. In *Sturlyn v. Albany*, Cro. Eliz. 67, it is said: 'When a thing is to be done by the plaintiff, be it never so small, this is sufficient consideration to ground an action.' Therefore anything which fulfills the requirements of consideration will support a promise whatever may be the comparative value of the consideration, and of the thing promised. Thus allowing a defendant to weigh boilers is sufficient consideration for a promise to give them up in good condition, or accepting services bargained for

even though valueless in fact, and surrendering a document though it has no value is sufficient consideration for a promise to pay a large price. . . . Discharging a debt barred by the Statute of Limitations, giving up an option the day before its expiration after acknowledging inability to exercise it, or naming a child in accordance with the wishes of the promisor, are sufficient considerations, and other illustrations might easily be given of the principle that adequacy of consideration is immaterial [citing *Presbyterian Board v. Smith*, 209 Pa. 361, 58 A. 689]." In the latter case this court held that a test of good consideration for a contract is whether the promisee, at the instance of the promisor, has done, forborne or undertaken to do anything real, or whether he has suffered any detriment, or whether in return for the promise he has done something that he was not bound to do or has promised to do some act or has abstained from doing something. If any of the elements of such test be established the consideration becomes sufficient to support a promise although its inadequacy may be grossly disproportionate to the promise. The law does not consider such inadequacy.

This court in *York Metal & Alloys Co. v. Cyclops Steel Co.*, 280 Pa. 585, 124 A. 752, in an opinion by Mr. Justice Sadler, said: " 'There is a consideration if the promisee, in return for the promise, does anything legal which he is not bound to do, or refrains from doing anything which he has a right to do, whether there is any actual loss or detriment to him or actual benefit to the promisor or not': 13 C. J. 316. 'Refraining from bringing a suit may furnish a consideration. The actual forbearance, or the promise to forbear, to prosecute a claim on which one has a right to sue is universally held to be a sufficient consideration': 13 C. J. 344." In *Shaw v. Philbrick*, 129 Me. 259, 151 A. 423, the Supreme Court of Maine said: "In the judicial reports, running parallel with decisions wherein consideration is based on benefit to the promisor, are decisions that when on the part of

the promisee, who was under no duty to do so, there has been an act, or omission to act, at the request of the promisor and upon the strength of his promise, which act or omission occasioned the promisee disadvantage, trouble, or prejudice, though slight and not actually harmful, there is legal value. In a legal sense, there is detriment. And detriment constitutes a valuable consideration." In *Weigand v. Standard Motor Co.,* 109 Pa. Superior Ct. 256, 167 A. 493, that court said: "There may be a consideration without the accrual of any benefit at all to the promisor. If the promisee has suffered any detriment however slight, or though he has suffered no real detriment, if he has done what he was not otherwise bound to do, in return for the promise, he has given a consideration and the court will not ask whether the promisor was benefited. . . . The disadvantage suffered by plaintiff or the benefit derived by defendant was on either phase sufficient consideration for the promise of the defendant motor company." In *Hind v. Holdship,* 2 Watts 104, this court held: "It is sufficient that a slight benefit be conferred by the plaintiff on the defendant or a third person; or even if the plaintiff sustain the least injury, inconvenience or detriment, or subject himself to any obligation, without benefiting the defendant or any other person. It is not essential that the consideration should be adequate in point of actual value. The law does not weigh the *quantum* of consideration, having no means of deciding on that matter; and it would be unwise to interfere with the facility of contracting, and the free exercise of the judgment and will of the parties. The law allows them to be the sole judges of the benefits to be derived from their bargains, provided there be no incompetency to contract, and the agreement violates no rule of law."

In *Hamer v. Sidway, Exr.,* 12 L. R. A. 463, the Court of Appeals of New York, in an opinion by Judge PARKER, held that a minor's abstinence from intoxicating liquors and tobacco, and from swearing or playing cards or bil-

liards for money, is a good consideration for a promise by his uncle to pay him a sum of money. Judge PARKER quoted with approval the following definition of "consideration": "A valuable consideration, in the sense of the law, may consist either in some right, interest, profit or benefit accruing to the one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other. Courts will not ask whether the thing which forms the consideration does in fact benefit the promisee or a third party, or is of any substantial value to anyone. It is enough that something is promised, done, forborne, or suffered by the party to whom the promise is made as consideration for the promise made to him." He then cites *Parsons on Contracts,* as follows: "In general a waiver of any legal right at the request of another party is a sufficient consideration for a promise." He also cites 2 *Kent, Com.,* 12 ed., 465, as follows: "Any damage or suspension, or forbearance of a right will be sufficient to sustain a promise." He quotes *Pollock on Contracts,* page 166: " 'Consideration' means not so much that one party is profiting as that the other abandons some legal right in the present, or limits his legal freedom of action in the future, as an inducement for the promise of the first." It was held in that case that plaintiff, having restricted his lawful freedom of action within certain prescribed limits upon the faith of his uncle's agreement, and now having fully performed the conditions imposed, is entitled to the $5,000 promised him. Judge PARKER cites the case of *Talbott v. Stemmons* (Ky.), 5 L. R. A. 856, in which the appellate court of that state held that a promise by a person to give $500 to his grandson at his death if the latter will never take another chew of tobacco or smoke another cigar during the promisor's life, was supported by sufficient consideration. In the case of *Lindell v. Rokes,* 60 Mo. 249, it was held that abstinence from the use of intoxicating liquors furnished a good consideration for a promissory note.

On another accepted theory also, the agreement of July 8th can be sustained as a valid contract. This theory was recognized by the Court of Appeals of New York in the following two cases: *Rogers v. Wiley,* 131 N. Y. 527, and *Emery v. Wilson,* 79 N. Y. 78.

In the former case the Court of Appeals of New York held that where one party is engaged in a business venture with another, from which he may retire at will, his continuance therein is a sufficient consideration to uphold a promise to allow him an advantage not embraced within the terms of the original contract. In such a case it may be inferred that the promisee continued in the business upon the strength of the promise. In this case, defendants were stockbrokers and sold certain shares of stock short for plaintiff, under an agreement which required plaintiff to keep on deposit a certain percentage of the amount necessary to make good the short sale, defendants to give reasonable notice of want of sufficient margin and of their intention to buy in if the requisite margin was not made good. The stock having advanced, plaintiff in various interviews informed defendants that he had concluded to close his short account and go long on the stock, but was dissuaded therefrom by them; they finally agreed that if the stock went up to a price specified, which would have exhausted the margin, they would not close plaintiff out but would carry the stock for him until he could get out all right; plaintiff thereupon consented to leave the matter as it was. The stock continued to advance but did not go above the price named. Defendants bought in at a price which about exhausted the margin, without notice to plaintiff; upon receiving notice of the purchase he repudiated it. The market subsequently declined and plaintiff directed defendants to buy to cover the short sale, to sell the securities held as a margin and to account; this they declined to do. In an action to recover damages it was held that defendants' promise to carry the stock without further margin gave a right to recover, whether considered as an agree-

ment with a sufficient consideration or as a waiver of notice to furnish more margin, or as an estoppel; in either case the purchase was unauthorized and plaintiff was entitled to recover the difference between the amount paid on such purchase and what the stock might have been bought for when plaintiff gave directions to purchase.

In the latter case the Court of Appeals of New York held that where one consents to continue the relationship of partners, in consequence of the promise of the other partner, there is a sufficient consideration to maintain an action based on the promise of the latter. Judge DANFORTH, who wrote the opinion for the court in that case, said: "He [the plaintiff] was under no obligation to remain in the firm, and it is not unreasonable to infer that the plaintiff consented to continue a member of the co-partnership in consequence of the defendant's promise, and that the promise of defendant was made to induce that consent. There was then a reciprocal agreement between the parties."

On still another theory the agreement in question can be sustained as a valid contract. That theory finds expression in several cases in this jurisdiction. In *Whitehill v. Schwartz*, 27 Pa. Superior Ct. 526, that court held that if there is a real contention between the parties, modification of the existing contract, to settle the differences, is supported by the reciprocal benefits which follow. In *Dreifus, Block & Co. v. Salvage Co.*, 194 Pa. 475, 45 A. 370, this court held that parties may at any time rescind their previous understanding and substitute another therefor where some consideration appears, and the new contract will take the place of that formerly entered into. See also *Flegal v. Hoover*, 156 Pa. 276, 27 A. 162; *Thompson v. Stone*, 43 Pa. Superior Ct. 69. This court also held in *McNish v. Reynolds, Lamberton & Co.*, 95 Pa. 483, that an agreement to an extension of time for performance by one is enough to support the supplemental understanding.

550

Not subscribing to the basic finding on which the majority opinion rests its conclusion, to wit, that the agreement of July 8, 1931, between plaintiffs and defendant was nudum pactum, I must dissent from that conclusion. As in many other cases* which have during late years been before us in actions between stockbrokers and their customers, the controlling issues here are issues of fact, the testimony on the respective sides is conflicting and what weight is to be given that respective and conflicting testimony is exclusively for the jury to say.

I think the court below reached a correct conclusion and I would not disturb its judgment.

Mr. Chief Justice KEPHART and Mr. Justice BARNES concur in this dissent.

---

* See *Newburger v. Eckerson,* 318 Pa. 72, 177 A. 797, and *Sisney v. Diffenderffer,* 323 Pa. 337, 185 A. 830.