## REED, FEARS & MILLER, Inc., v. MILLER.

(District Court, E. D. Pennsylvania. November 14, 1924.)

### No. 2799.

**1. Contracts ⬤═62(1)—Agreement not to engage in pig iron business held supported by consideration also supporting transfer of corporate stock.**

Where president of corporation wrote to it offering to sell his stock at certain price and his offer was accepted at directors' meeting, and on same day formal memorandum of agreement was executed, 10 per cent. of price being paid in cash, remainder to be paid on certain date, clause in memorandum, whereby president agreed not to engage in pig iron business for three years, was supported by consideration, though letter making offer contained nothing concerning such a clause.

**2. Contracts ⬤═82, 117(2)—Agreements in restraint of trade not void when limited in time or partial in operation, and there is consideration; consideration must be stated.**

While agreements in restraint of trade generally are void, they are not so when limited in time, or partial in their operation, and when there is sufficient consideration, but consideration must appear on face of agreement.

**3. Contracts ⬤═246, 274—May be discharged at any time before performance by new agreement with effect of altering terms of original agreement or of total rescission.**

Since contract is result of agreement, it may be ended by agreement and may be discharged at any time before performance is due by new agreement with effect of altering terms of original agreement, or of rescinding it altogether.

**4. Contracts ⬤═202(2)—Agreement that defendant "shall not, * * * either directly or indirectly, as agent or employee engage in the pig iron business," did not permit defendant to engage as principal in pig iron business.**

Agreement that defendant "shall not, * * * either directly or indirectly, as agent or employee, engage in the pig iron business," did not permit defendant to engage in pig iron business as principal.

**5. Contracts ⬤═312(4) — One becoming president of corporation in pig iron business was engaged "directly or indirectly as agent or employee" in business within agreement not to engage in such business.**

Stockholder and officer of corporation, selling his stock to corporation, by becoming president of another corporation engaged in pig iron business, violated his agreement not to "either directly or indirectly, as agent or employee, engage in the pig iron business."

**6. Contracts ⬤═322(3)—One acting as president of corporation engaged in pig iron business, along with other business, held shown to have take active interest in such part of business.**

Stockholder of one corporation, who agreed on sale of stock not to engage in pig iron business as agent or employee of some other company, *held* shown, as president of another corporation, to have taken an active interest in pig iron end of its business.

**7. Courts ⬤═328(3)—Injunction held to operate as well to determine liability for damages, as to restrain in future one violating agreement not to engage in certain business as affecting jurisdictional amount involved.**

Where one selling stock to corporation and agreeing not to engage in pig iron business violates his agreement, his acts are continuing, and injunction will operate as well to determine his liability for damages as to restrain him in future, as affecting question whether jurisdictional amount of $3,000 is involved.

**8. Courts ⬤═329—Bill should not be dismissed unless lack of jurisdictional amount involved clearly appears.**

Bill in federal court should not be dismissed unless lack of jurisdictional amount involved clearly appears.

**9. Injunction ⬤═61(2)—Lies to restrain breach of agreement not to engage in certain business.**

Where stockholder of corporation violated agreement, entered into when he sold his stock to corporation, not to engage in pig iron business, injunction should issue to restrain future violation.

In Equity. Bill by Reed, Fears & Miller, Inc., against John G. Miller. Decree for plaintiff.

Arthur G. Dickson, of Philadelphia, Pa., and John H. Devine, of Boston, Mass., for plaintiff.

William A. Schnader, of Philadelphia, Pa., for defendant.

THOMPSON, District Judge. The plaintiff, a corporation of Delaware, having its principal place of business in Boston, has been engaged for some years in the pig iron, coal, and coke business, having customers throughout the New England States, New York, New Jersey, Pennsylvania, Maryland, District of Columbia, Virginia, and West Virginia. The defendant, John G. Miller, held 493 shares of the capital stock of the plaintiff corporation and was a member of its board of directors and president of the corporation. On March 18, 1922, the defendant, being desirous of selling his stock and severing his connection with the plaintiff company, made the plaintiff an offer in writing as follows:

"Reed, Fears & Miller, Inc., 141 Milk Street, Boston, Massachusetts—Gentlemen: I hereby offer to your company four hundred and ninety-three (493) shares of the capital stock of Reed, Fears & Miller, Inc., at ninety ($90) dollars per share, or $44,370.

"If acceptable to your company ten (10%) per cent. shall be paid as an initial payment on or before March 27, 1922, and the balance on or before May 1, 1922. Upon the final payment being made I shall turn over the shares of stock to the company with such other papers as may be necessary to vest full and complete title in the company.

"I also agree to remain in the employ of the company until May 1, 1922, at my present salary, and shall do what I can in pro-

moting the company's best interests while I remain with it.

"Yours very truly, J. G. Miller."

At a directors' meeting of the plaintiff company held March 27, 1922, after full discussion, the following vote was had, and recorded upon the minutes of the company:

"Voted: That the offer of J. G. Miller, as contained in his letter to this corporation dated March 18, 1922, to sell to this corporation four hundred ninety-three (493) shares of the capital stock of Reed, Fears & Miller, Inc., at ninety dollars ($90) per share, or a total of $44,370, be and the same is hereby accepted, and that the treasurer of this corporation is hereby authorized, empowered and directed to pay from the funds of this corporation the initial payment of ten (10%) per cent., and the balance on or before May 1, 1922."

Upon the same day, a formal memorandum of agreement was executed by the corporation under its seal and by the defendant without seal in which the parties agreed, "in consideration of $1 and other good and valuable consideration each to the other paid," that Miller sell and Reed, Fears, & Miller purchase the 493 shares of stock at $90 per share, or $44,370, 10 per cent. to be paid that day and the balance on or before May 1, 1922. This agreement contained the following clause which was no part of the offer contained in Miller's letter of March 18:

"Fourth. It is further understood and agreed that the said John G. Miller shall not, within the period of three years from the first day of May, 1922, either directly or indirectly, as agent or employee, engage in the pig iron business as conducted by Reed, Fears & Miller, Inc., and including buying and selling on commission, within the following states, viz., New England States, New York, Pennsylvania, New Jersey, Maryland, District of Columbia, Delaware, Virginia, and West Virginia."

The agreement above referred to, although not then executed, was discussed and read at the meeting.

On May 1, 1922, when Mr. Miller left the plaintiff company, he entered into the coal and coke business in partnership with Ida N. Garrison, who was a stockholder of the plaintiff company and had sold her stock and left the plaintiff's employ at the same time that Mr. Miller did so. Some months after May 1, 1922, when Mr. Miller's connection with the plaintiff was terminated, he entered into an arrangement with Harry D. Carson of Carson & Co., then engaged in the pig iron business, to consolidate the two firms of John G. Miller & Co. and Carson & Co. as a corporation under the name of Miller, Carson & Co., Inc.; the objects and purposes of the company, inter alia, being to sell or otherwise dispose of pig iron.

An announcement of the consolidation and incorporation and its purpose to specialize, inter alia, in the production and sale of pig iron, was sent out to the trade naming as president the defendant, John G. Miller, and as pig iron sales manager Don A. Marshall, formerly with Reed, Fears & Miller, Inc. Don A. Marshall had been a sales manager for Reed, Fears & Miller, Inc., and remained with them until shortly after the time of Mr. Miller severing his connection with that corporation.

The evidence showed that Miller, Carson & Co., Inc., was actively engaged in the production and sale of pig iron and that its business was conducted in the states wherein Miller, under the agreement of March 27, 1922, had agreed not to engage in the pig iron business.

The plaintiff seeks to enjoin the defendant from interfering directly or indirectly with the business of the plaintiff, from attempting to secure for himself or others the plaintiff's employees or interfering with those in the plaintiff's employ, and from working for or holding stock in or being otherwise connected directly or indirectly with Miller, Carson & Co., Inc., or any others engaged in the business of manufacturing, buying, or selling of pig iron.

The defendant sets up the following defenses in law: First, that the agreement contained in the fourth paragraph of the agreement between the parties was without consideration because, at the time the formal agreement was signed, the defendant's offer to sell his stock had been accepted by vote of the plaintiff's board of directors, and that his offer and the acceptance thereof constituted a complete and binding contract between the parties, and that no further consideration moved to the defendant to support his agreement not to engage in the pig iron business. Second, that, if the fourth paragraph is binding upon the defendant, it cannot be construed to include his conducting business either as president of Miller, Carson & Co., Inc., nor his engaging in pig iron business for himself as principal; the contention being that the words "either directly or indirectly, as agent or employee," do not include his so engaging in the pig iron business. The de-

fendant also contends that the evidence does not show that, as president of Miller, Carson & Co., Inc., he is engaged in or has any connection with the pig iron business of that corporation.

In support of his first contention, the defendant's counsel relies on the case of Cleaver v. Lenhart, 182 Pa. 285, 37 A. 811. In that case, Cleaver sold his creameries on June 6, 1895, to Lenhart. The conveyances were duly made and the consideration money paid. On June 29, 1895, the parties entered into another agreement by which, "for and in consideration of the purchase and conveyance to the said party of the second part of two certain creameries," etc., Lenhart agreed not to engage in the manufacture of butter nor purchase or sale of milk within a radius of five miles of any of the creameries sold for a period of three years. The court said:

"The agreement in suit is a contract in partial restraint of trade. As such, under all the authorities, it must, as one of the essential elements, be founded upon a good and sufficient consideration. In Keeler v. Taylor, 53 Pa. 467, Woodward, C. J., delivering the opinion, said: 'The general rule is that all restraints of trade, if nothing more appear, are bad. This was the rule laid down in the famous case of Mitchel v. Reynolds, 1 P. Wms. 181. But to this general rule there are some exceptions, as, if the restraint be only particular in respect to time or place, and there be a good consideration given to the party restrained.' * * *

"In the present case there is no doubt about the terms of the restraining agreement. It is sufficiently specific as to time and place within which the restraint is to be operative. But it has no consideration to support it. The previous sale being complete in all respects, the duty of the parties on both sides was clearly defined, and the obligation to perform it was comprehended within its express provisions. The agreement in restraint was no part of its terms and there was no obligation on the part of Lenhart to restrain his operations thereafter. It was held in Wimer v. Overseers, 104 Pa. 317, that where a legal obligation exists, a cumulative promise to perform it unless upon a new consideration, is a nullity. Hence the obligation of Lenhart to perfect the sale under the first agreement and the obligation of Cleaver to comply with its terms could not be a consideration for the restraining agreement of the subsequent date. The latter paper was a mere voluntary agreement in restraint of trade and, as such, cannot have legal sanction."

[1] Assuming that a complete contract existed between the parties through Miller's written offer and the acceptance thereof contained in the vote at the directors' meeting, the situation in the present case is not on all fours with that in Cleaver v. Lenhart. The contract in that case was an executed one before the parties entered into the agreement of June 29. In the case at bar, nothing was done to carry out the terms of the alleged prior contract before the formal agreement containing the restraining clause was signed and delivered. All the transactions involving the agreement took place upon the same day, and it becomes a question of fact as to what was the contract of the parties. The formal agreement, which was subsequently executed, was before the board of directors at the meeting at which the vote was taken to accept the offer contained in the letter of March 18, and, immediately subsequent to the directors' meeting, the formal agreement was signed. There was therefore no necessity for further consideration for the restraining clause if both parties agreed that the money to be paid should be the consideration therefor as well as the consideration for the sale and transfer of the stock. The plaintiff paid the remaining 90 per cent. of the purchase money on the faith of Miller's agreement not to engage in the territory and for the period named, in the pig iron business, and I have no hesitation in concluding that the formal signed agreement constituted the contract between the parties.

[2] While agreements in restraint of trade generally are void, they are not so when limited in time or partial in their operation and when there is a sufficient consideration. In this class of cases a consideration must appear on the face of the agreement. Gompers v. Rochester, 56 Pa. 194; Hall's Appeal, 60 Pa. 458, 100 Am. Dec. 584.

[3] As a contract is the result of agreement, so an agreement may put an end to a contract. Therefore a contract may be discharged at any time before performance is due by a new agreement with the effect of altering the terms of the original agreement or of rescinding it altogether; and a claim under the original contract may then be met by the new agreement so far as the latter operates to alter or rescind the former. 9 Cyc. 593; Dunham v. Barnes, 9

Allen (Mass.) 352. Johnson v. Reed, 9 Mass. 78, 6 Am. Dec. 36.

If Miller's offer and the acceptance by the board of directors did constitute a binding contract, yet the parties rescinded it by mutual consent, and the surrender of their mutual rights was sufficient consideration. But their rights must be determined exclusively by the formal agreement entered into upon the same day. Flegal v. Hoover, 156 Pa. 276, 27 A. 162; Dreifus, Block & Co. v. Salvage Co., 194 Pa. 475, 45 A. 370, 75 Am. St. Rep. 704.

The one valid subsisting contract between the parties is contained in the formal agreement of March 27, 1922. The prior agreement, if it existed, being merely executory, was discharged or rescinded by the new agreement.

[4] Coming now to the construction of the fourth paragraph, the contest is over the meaning of the language "that the said John G. Miller shall not, * * * either directly or indirectly, as agent or employee engage in the pig iron business."

Construing the language with regard to the circumstances of the transaction, I cannot agree with the narrow construction placed upon the language by counsel for the defendant. The construction sought to be put upon it is based upon the contention that the words "either directly or indirectly" qualify the following words "as agent or employee," and that therefore defendant was at liberty to engage as principal in the pig iron business, so long as he was not engaging as agent for or employee of another. This construction does not appear to me to be reasonable when it is considered that the evident purpose of the agreement is the protection of the plaintiff in purchasing Miller's stock against competition with it by Miller in the particular branch of their business with which Miller had been most closely identified, and in which he had obtained a prominent standing and recognition in the trade. As I read the language, therefore, the two qualifying clauses are each to be taken in connection with the predicate "engage in the pig iron business," and, as so construed, the language meant that Miller should not either directly or indirectly engage in the pig iron business or as agent or employee engage in the pig iron business.

[5] If, however, the defendant's contention is correct, he is not helped by this construction. He assisted in organizing, became a stockholder, and became president of a corporation, the purpose of which,

among other things, was to sell or otherwise dispose of pig iron. As president of that corporation, he is its chief officer representing it in its business. He is thus engaged either directly or indirectly as its agent in carrying on the very business in which he agreed not to engage as such, and that he did it with the intent to use whatever prestige he had in obtaining business which might have been obtained by the plaintiff is entirely apparent. Any other conclusion would be a reflection upon his own intelligence.

The responsibility for the action of Don A. Marshall in leaving the employ of the plaintiff is not to be attributed to Miller, for Marshall was free to remain or quit; but an inference of the defendant's intent is irresistibly drawn from the fact that the new corporation immediately took Marshall into its employ, made him pig iron sales manager, and announced to the trade that he was formerly with Reed, Fears & Miller, Inc.

[6] It is contended on the part of the defendant that he has not taken any active interest in the pig iron end of the business of Miller, Carson & Co. and has not solicited orders for pig iron nor given any instructions for the solicitation of pig iron orders by either Carson or Marshall. It is shown however, that he was present at the regular meetings of the sales managers and salesmen when the pig iron business was discussed along with other branches of the business, and knowledge must be imputed to him that his standing and influence in the pig iron trade would be and was a valuable asset to Miller, Carson & Co., Inc., in influencing former customers of the plaintiff to deal with the new corporation to the injury of the plaintiff's business.

[7, 8] The defendant attacks the jurisdiction of the court upon the ground that there is no evidence to show injury to the plaintiff to the extent of more than $3,000. The bill affirmatively alleged that the amount involved and in dispute exceeds $3,000, and prays for an injunction, an accounting, and for damages sustained by reason of the defendant's unlawful acts. The damages were not liquidated from the evidence produced as the court left the liquidation of damages open for further proof. The acts of the defendant in violation of his agreement, however, are continuing acts, and an injunction will operate as well to determine his liability for damages as to restrain him in the future. The value to the plaintiffs of an injunction may

well be, from what appears on the record, in excess of $3,000, and, although that is not positively ascertained, the bill should not be dismissed unless the lack of jurisdictional amount involved clearly appears. Wetmore v. Rymer, 169 U. S. 115, 18 S. Ct. 293, 42 L. Ed. 682; Barry v. Edmunds, 116 U. S. 550, 6 S. Ct. 501, 29 L. Ed. 729.

[9] There is sufficient proof that the defendant in organizing and becoming a stockholder in Miller, Carson & Co., Inc., and in becoming president thereof, did so in violation of his agreement of March 27, 1922, that he has directly and indirectly, as president of and agent for Miller, Carson & Co., interfered and competed with the business of the plaintiff to its injury, and it follows that an injunction should issue to restrain these acts. Anchor Electric Co. v. Hawkes, 171 Mass. 101, 50 N. E. 509, 41 L. R. A. 189, 68 Am. St. Rep. 403; Old Corner Book Store v. Upham, 194 Mass. 101, 80 N. E. 228, 120 Am. St. Rep. 532; Cincinnati Exhibition Co. v. Marsans (D. C.) 216 F. 269; Philadelphia Ball Club, Limited, v. Lajoie, 202 Pa. 210, 51 A. 973, 58 L. R. A. 227, 90 Am. St. Rep. 627; Shubert Theatrical Co. v. Rath (C. C. A.) 271 F. 827, 20 A. L. R. 846.

Counsel may present a decree enjoining the defendant from engaging or continuing to engage directly or indirectly as president, agent, or employee in the business conducted by Miller, Carson & Co., Inc., from holding or continuing to hold or own any stock in the said corporation, and from engaging in the pig iron business, including buying and selling on commission, for himself or any other person within the states named in the agreement between the parties within a period of three years from May 1, 1922. The decree may contain an order for accounting to the plaintiff for damages sustained by the defendant's wrongful acts with reference to a special master to ascertain and report the damages.