**In re RBGSC INVESTMENT CORP., Debtor.**

**Red Bell Brewing Company and Red Bell Brewery and Pub Company—Headhouse, Inc., Plaintiffs,**

v.

**GS Capital, L.P., Bella's Place, Inc., RBGSC Investment Corp., and Nick Sommaripa, Defendants.**

Bankruptcy No. 99–31799DAS.
Adversary No. 99–0892.

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Jan. 5, 2000.

Walter Weir, Jr., Weir & Partners, Philadelphia, PA, for debtors.

Michael T. Farrell, Post & Schell, P.C., Kevin J. Carey, Philadelphia, PA, for Red Bell.

Paul B. Maschmeyer, Ciardi, Maschmeyer & Karalis, PC, Philadelphia, PA, for Creditors' Committee.

Kenneth E. Aaron, Buchanan Ingersoll, P.C., Philadelphia, PA, for GS Capital, L.P.

David B. Smith, Philadelphia, PA, for Bella's Place, Inc. and Nick Sommaripa.

George E. Pallas, Cohen, Seglias, Pallas & Greenhall, P.C., Philadelphia, PA, for debtor in Common Pleas Action.

Jeffrey Meyers, Philadelphia, PA, for Marketplace Redwood, L.P.

Joseph A. Dworetsky, Philadelphia, PA, for Headhouse Retail Associates, L.P.

Joseph DiGiuseppe, Philadelphia, PA, for City of Philadelphia.

Frederic Baker, Ass't U.S. Trustee, Philadelphia, PA, trustee.

*OPINION*

DAVID A. SCHOLL, Bankruptcy Judge.

## A. INTRODUCTION

The instant proceeding ("the Proceeding"), was removed from state court and retained here for reasons discussed in a prior opinion arising out of the instant voluntary Chapter 11 bankruptcy case of RBGSC INVESTMENT CORP. ("the Debtor"), published at 240 B.R. 536, 542–44 (Bankr.E.D.Pa.1999) ("*RBGSC I*"). By agreement of the parties in the course of the trial of the Proceeding on December 1, 1999, we are presently confined to deciding whether the Defendants in the Proceeding, the Debtor, GS CAPITAL, L.P. ("GS"), BELLA'S PLACE, INC. ("BP"), and NICK SOMMARIPA, or any of them, are liable to the Plaintiffs herein, RED BELL BREWING COMPANY ("RBBC") and RED BELL BREWERY AND PUB

COMPANY—HEADHOUSE, INC. ("RBHH"), for breaching the contracts among the parties; if so, whether injunctive relief or other relief is appropriate to remedy those breaches; and whether the Defendants are entitled to relief on their counterclaim.

We find that the Plaintiffs' claims, amounting to almost $10 million, are grossly overblown. Analyzing all of the contract-related claims, excepting the Plaintiffs' claims for defamation and "interference with business relations," we find that only the following are viable: (1) a claim of RBBC against BP only for license fees due under those parties' License and Consulting Agreement of May 20, 1998 ("the LCA") through only the end of the one-year term of the LCA, May 19, 1999, which appears to amount to less than $20,000; and (2) a claim of RBBC against BP order an oral contact regarding sales of RBBC's wearable items, which is only made in the amount of $1256.00.

In the course of this discussion, which follows from what we consider a straightforward analysis of the parties' contracts, we find that the Plaintiffs have no continuing rights in the two "brew pub" sites at issue, which may resolve the issue raised in the counterclaim regarding the liquor license at one of the sites without resort to the injunction requested by the Defendants against the Plaintiffs in the counterclaim. A further hearing on damages, the issues not addressed herein, and the counterclaim is scheduled on January 26, 2000.

## B. FACTUAL AND PROCEDURAL HISTORY

We incorporate herein the procedural and factual history recited in *RBGSC I*, 240 B.R. at 539–41. That recitation, *id.* at 540, included reference to the parties' last written contract, a Settlement Agreement of December 10, 1998 ("the SA"). The SA succeeded a letter of intent of December 5, 1997 ("the LOI"), between Ken Sweet of GS and James Bell of RBBC to enter into a management contract and joint venture to own and operate a brew pub featuring RBBC products in the Reading Terminal Headhouse in Center City Philadelphia ("the Headhouse Site"). *Id.* at 539–40. Subsequent and pursuant to the LOI, the LCA, regarding the establishment of another much smaller brew pub site in the Philadelphia International Airport ("the Airport Site") and a Management Agreement between the Debtor, BP, and GS ("the MA") regarding the Headhouse Site were both executed on May 20, 1998. The Debtor's motion to reject the MA was granted, over the Plaintiffs' objection, in *RBGSC I*, 240 B.R. at 541–42.

The Proceeding is based upon a Complaint filed by the Plaintiffs in the Philadelphia Court of Common Pleas ("the CCP") on May 21, 1999, which recites nine Counts seeking the following relief against all of the Defendants except Sommaripa, who is referenced in the eighth Count only:

(1) an injunction to prevent them from terminating the LCA;

(2) an injunction to prevent them from terminating the MA;

(3) damages for violating the LCA;

(4) an order granting specific performance of the LCA;

(5) damages for breach of an alleged oral contract to pay RBBC for certain wearable goods, *e.g.*, tee-shirts, hats, etc., sold at the Airport Site;

(6) damages from breach of the MA;

(7) an order granting specific performance of the MA;

(8) damages for statements which allegedly defamed the Plaintiffs by Sweet and Sommaripa;

(9) damages for interfering with the Plaintiffs' business relationships through

their attempts to terminate the LCA and the MA and the foregoing defamation.

We must note several relevant developments in the Debtor's main bankruptcy case since *RBGSC I* was decided on November 2, 1999. First, the Debtor has solicited votes on a Modified Plan of Reorganization ("the Plan"), which contemplates the Debtor's assumption, sale, and assignment of its leases at the two Sites. A confirmation hearing in reference to Plan scheduled on December 15, 1999, was continued to January 12, 2000. Second, on December 13, 1999, the Debtor filed a motion to sell substantially all of its assets, including a sale and assignment of its leases, to Joseph Evancich and William De-Marco, who allegedly own and operate the Dock Street Brewery, an entity similar to RBBC, for $2,850,000 ("the Sale Motion"). A hearing on the Sale Motion is scheduled on January 6, 2000, along with a motion by RBBC seeking an administrative claim of $19,250, based on its alleged post-petition rights under the LCA. Finally, on the claims bar date, November 30, 1999, the Plaintiffs filed a joint proof of claim in the total amount of $9,728,227.70 "plus other unliquidated sums." The proof of claim enumerated eight items, with the following accompanying calculation of damages for each:

(1) an Airport Site revenue claim, measured over the 10–year period of the Debtor's Airport Site lease at $5,550/month, for a total of $666,000;

(2) a Headhouse Site revenue claim, measured over 26 years of the Debtor's Headhouse Site lease at $164,000/year, for a total of $4,264,000;

(3) RBBC "management's time and expenses," at $149,321.77;

(4) LCA fees due between January and November, 1999, at $51,650;

(5) RBBC advances to vendors during construction, at $26,000;

(6) loss of "high profile strategically planned locations, and proprietary designed properties," at $500,000;

(7) breach of an oral wearables sale contract, at $1256;

(8) "irreparable harm and damage" to RBBC's trade name and marks, at $1,000,000; and

(9) damages for defamation by Sweet and Sommaripa, at $500,000.

At the trial of December 1, 1999, the parties agreed to incorporate, as part of the record, the testimony and exhibits presented not only in the trial of the preliminary injunction hearing in the Proceeding in the CCP, but also in the hearings of October 5, October 13, and October 20, 1999, addressing other matters at issue in this case, described in *RBGSC I*, 240 B.R. at 539. In the course of the seven-hour hearing of December 1, 1999, the Plaintiffs called Sommaripa as on cross-examination, Bell, and Robert T. Huttick, RBBC's vice-president and managing director. The Defendants called Michael Plumley, an attorney for the Pennsylvania Liquor Control Board ("the LCB"), by telephone; and Cynthia Gowdy, GS's President.

The Plaintiffs argue that GS, BP, and the Debtor are liable, jointly and severally, for alleged violations of the LOI, LCA, and MA, which they contend manifested a willful campaign to destroy a contemplated joint-venture-type arrangement between the parties to establish and operate RBBC brew pubs at two strategic Philadelphia sites and to then seize these sites for themselves. To the extent that provisions in the SA contradict any such claims, particularly those based on the LOI, the Plaintiffs suggest that these provisions can be disregarded because Bell was pressured to give up his ownership in the venture as part of the Plaintiffs' campaign. The Defendants, meanwhile, argue that the rights of the Plaintiffs are limited to those pro-

vided for in the contracts and may be asserted against only the parties to those particular contracts.

Both parties expended considerable energy debating whether letters of March 17, 1999, and May 3, 1999 ("the Letters"), from the Defendants' counsel to Bell, described in *RBGSC I*, 240 B.R. at 540–41, validly terminated the parties' relationships under the LCA and MA. The Proceeding in the CCP, by agreement there of the parties, focused exclusively on whether RBBC had become insolvent, thus allegedly justifying the alleged termination. Although the Defendants articulated several alternative additional grounds for its actions in this court, ultimately RBBC's alleged insolvency again become the focal point for this action.

After the trial of December 1, 1999, the parties agreed to simultaneously submit opening and reply briefs by December 15, 1999, and December 22, 1999, respectively. These dates were ultimately extended by agreement to December 20, 1999, and December 28, 1999, respectively.

## C. DISCUSSION

■ Our application of several rather elementary legal principles of contract interpretation and corporate law in interpreting the precise language of the contracts resolves most of the disputes among the parties. First, we conclude, rather unremarkably, that all of the contracts between and among the various parties must be interpreted and enforced as written. As we recently held in *In re U.S. Physicians, Inc.*, 236 B.R. 593, 599 (Bankr. E.D.Pa.1999); and *In re U.S. Physicians, Inc.*, 235 B.R. 367, 374–75 (Bankr.E.D.Pa. 1999),

> [t]he principle [that a contract should be interpreted according to the cause of performance between the parties,] [as opposed to its terms,] applies only if there is some degree of ambiguity re-

garding the meaning of the contract terms regarding which the course of performance is at issue. As we held in *In re St. Mary Hospital*, 101 B.R. 451, 461 (Bankr.E.D.Pa.1989), an unambiguous contract provision must be interpreted as it is written, not as the parties may have meant it or interpreted it. *See, e.g., Philadelphia, W. & B.R. v. Trimble*, 77 U.S. (10 Wall.) 367, 377, 19 L.Ed. 948 (1870); *In re Penn Central Transportation Co.*, 831 F.2d 1221, 1225–28 (3d Cir.1987); *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009–14 (3d Cir.1980); *In re Temp–Way Corp.*, 82 B.R. 747, 751 (Bankr.E.D.Pa.1988); 1 [A. CORBIN, CORBIN ON CONTRACTS,] 104, at 464 (1963); and 4 [S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS,] 610, at 499–500 (3d ed. Jaeger 1961). *See also, e.g., In re St. Mary Hospital*, 117 B.R. 125, 131–32 (Bankr. E.D.Pa.1990).

*See also In re LaBrum & Doak, L.L.P.*, 227 B.R. 391, 401 (Bankr.E.D.Pa.1998).

■ We reject all claims by the Plaintiffs that certain provisions of the SA, LCA, and MA cannot be enforced against them because Bell was pressured into signing these contracts and that they manifested improper attempts by GS to wrest control of the Sites away from RBBC. As is established in *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 893 (3d Cir.1975), duress at execution of a contract such as is sufficient to avoid enforcement of a contractual provision against a contracting party is not established by the presence of "pressure of financial circumstances," and can be invoked only if threats of actual bodily harm are made. *See also Plechner v. Widener College, Inc.*, 569 F.2d 1250, 1260 (3d Cir.1977); *Sheppard v. Aerospatiale*, 165 F.R.D. 449, 453 (E.D.Pa.1996); *Temp–Way Corp. v. Continental Bank*, 139 B.R. 299, 319 (E.D.Pa.), *aff'd*, 981 F.2d 1248 (3d Cir.1992); and

*Degenhardt v. Dillon Co.*, 543 Pa. 146, ——, 669 A.2d 946, 950–51 (1996). The only pressure alleged to have been exerted by the Defendants is the presence of financial circumstances, not physical threats or deprivation of access to counsel. Therefore, insufficient factors exist to render any contract terms unenforceable.

■ We also note that the Plaintiffs are quick to assert provisions of the SA in their favor, *see* page 18 *infra*, but reluctant to accept that they are bound by those they now find unfavorable. *See In re Modern Laundry & Dry Cleaning Co.*, 1992 WL 295827, at *1 (Bankr.E.D.Pa. Oct. 15, 1992). A party accepting the benefits of a contract is bound to its burdens on the theory that acceptance of the benefits constitutes ratification of the contract. *See In re Eton Furniture Co.*, 286 F.2d 93, 96 (3d Cir.1961).

■ A contract must be read as a whole. *See, e.g., Western United Life Assurance Co. v. Hayden*, 64 F.3d 833, 837 (3d Cir.1995). While it is possible to strike contractual provisions which are proven to be unconscionable,

> [t]he party challenging a contract provision as unconscionable generally bears the burden of proving unconscionability. *Bishop v. Washington*, 331 Pa.Super. 387, 480 A.2d 1088, 1094 (Pa.Super.1984); *see also Argo Welded Products, Inc. v. J.T. Ryerson Steel & Sons*, 528 F.Supp. 583, 592–93 (E.D.Pa.1981).

> In evaluating claims of unconscionability, courts generally recognize two categories, procedural, or "unfair surprise," unconscionability and substantive unconscionability. *See Ferguson v. Lakeland Mut. Ins. Co.*, 408 Pa.Super. 332, 596 A.2d 883, 885 (Pa.Super.1991); *Bishop*, 480 A.2d at 1095; *Germantown [Mfg. Co. v. Rawlinson*, 341 Pa.Super. 42, 491 A.2d 138,] at 145–46 [(1985)]. Procedural unconscionability pertains to the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language.... Substantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent. *See, id.*, at 145–147; *Denlinger, Inc. v. Dendler*, 415 Pa.Super. 164, 608 A.2d 1061, 1068 (Pa.Super.1992)....

*Harris v. Green Tree Financial Corp.*, 183 F.3d 173, 181 (1999). No sort of procedural unconscionability appears. We find that any inequality of bargaining power between the Bell entities and the GS entities was slight and that no provisions of any of the contracts are so unreasonably or grossly favorable to the GS entities as to the substantively unconscionable. *Id.* at 183–84. Unconscionability is not even expressly invoked by the plaintiffs. Therefore, the Plaintiffs are held to the provisions of these contracts as written.

■ Elementary principles of corporate law provide reasons for rejecting the Plaintiffs' claims that we can consider all of the Defendants as the contracting entities in all of the contracts simply because GS is the parent of the other Defendant entities. What the Plaintiffs are undertaking in making this argument is an unarticulated alter ego or "reverse corporate veil-piercing" theory. However, as we stated in *In re Main, Inc.*, 213 B.R. 67, 87–89, *modified in part on other grounds*, 1997 WL 626544 (Bankr.E.D.Pa. Oct. 7, 1997), *aff'd on relevant grounds sub nom. In re Blatstein*, 226 B.R. 140, 158–59 (E.D.Pa.1998), *aff'd on relevant grounds*, 192 F.3d 88, 99–101 (3d Cir.1999),

> a corporation is a legal entity which is ordinarily deemed to be separate and distinct from its officers, directors, and stockholders and must be upheld unless there are specific circumstances which call for an exception to this rule. *See Zubik v. Zubik*, 384 F.2d 267, 273 (3d

Cir.1967), *cert. denied,* 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968); *In re Nutri/System, Inc.,* 169 B.R. 854, 869 (Bankr.E.D.Pa.1994) (*"Nutri/System I"*), *aff'd sub nom. In re Nutri/System of Florida Associates,* 178 B.R. 645 (E.D.Pa.1995) (*"Nutri/System II"*); and *Ashley v. Ashley,* 482 Pa. 228, 237, 393 A.2d 637, 641 (1978). Consequently, the validity of a corporate entity cannot be lightly disregarded. *See DuSesoi v. United Refining Co.,* 540 F.Supp. 1260, 1266 (W.D.Pa.1982).

The Pennsylvania Supreme Court, as well as federal courts sitting in Pennsylvania, has held that a corporate veil can be perceived only when the person in control of the corporation uses control of the corporation solely to further personal interests. *See Nutri/System I, supra,* 169 B.R. at 869; and *College Watercolor Group, Inc. v. William H. Newbauer, Inc.,* 468 Pa. 103, 117, 360 A.2d 200, 207 (1976). Piercing of the corporate veil is therefore a narrow exception to the general rule of corporate autonomy. It has also been held that a corporate veil will be pierced only when either it is necessary to avoid injustice to another party, *see Nutri/System II, supra,* 178 B.R. at 653; *Nutri/System I, supra,* 169 B.R. at 869; and *Rinck v. Rinck,* 363 Pa.Super. 593, 597, 526 A.2d 1221, 1223 (1987); equity requires that the corporate veil be pierced to prevent an injustice, illegality or fraud; or recognizing the corporate entity would result in a violation of public policy or protect someone from liability for a crime. *See In re Rosco Investors, L.P.,* 1996 WL 107503, at *7 (Bankr.E.D.Pa. March 6, 1996); *Ashley, supra,* 482 Pa. at 237, 393 A.2d at 641; and *Village at Camelback v. Carr,* 371 Pa.Super. 452, 461, 538 A.2d 528, 533 (1988), *aff'd,* 524 Pa. 330, 572 A.2d 1 (1990). *See also Wheeling–Pittsburgh Steel Corp. v. Intersteel, Inc.,* 758 F.Supp. 1054, 1059 (W.D.Pa.1990); and *Zubik, supra,* 384 F.2d at 273.

The Third Circuit Court of Appeals has held that

"[t]he corporate veil is pierced only when 'the corporation was an artifice and a sham to execute illegitimate purposes and [an] abuse of the corporate fiction and immunity that it carries.' *Wheeling–Pittsburgh Steel Corp. v. Intersteel, Inc.,* 758 F.Supp. 1054, 1058 (W.D.Pa.1990) (citing *Zubik v. Zubik,* 384 F.2d 267 (3d Cir. 1967), *cert. denied,* 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968)). 'In deciding whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholders' traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting the facade for the operations of the dominant shareholder.' *Id.* at 1057, 88 S.Ct. 1183 (citing *Carpenters Health & Welfare Fund v. Kenneth R. Ambrose, Inc.,* 727 F.2d 279 (3d Cir.1983))."

*Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503, 1521 (3d Cir.1994), *aff'd,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Thus, an individual cannot be held personally liable for the obligations of a corporation unless a court determines that the corporation is the alter ego of that individual. *Id.* at 1520–23; and *Zubik, supra,* 384 F.2d at 270–74.

Factors to consider in determining whether the corporate veil can be pierced include (1) a failure to observe the corporate formalities; (2) non-payment of corporate dividends; (3) insolvency of the debtor corporation at the time of a significant action or transaction; (4) siphoning of corporate funds by the dominant shareholder; (5) non-functioning of the other officers or directors of the corporation; (6) lack or absence of corporate records; (7) establishment

that the corporation is merely a sham for the operations of the dominant stockholder(s); and (8) undercapitalization of the corporation. *Kaplan, supra,* 19 F.3d at 1521; *United States v. Pisani,* 646 F.2d 83, 88 (3d Cir.1981); *Wheeling–Pittsburgh, supra,* 758 F.Supp. at 1059; *Nutri/System II, supra,* 178 B.R. at 654; and *Nutri/System I, supra,* 169 B.R. at 870. Proof of these factors must be by a preponderance of the evidence. *Zubik, supra,* 384 F.2d at 270 n. 2; and *Wheeling–Pittsburgh, supra,* 758 F.Supp. at 1058. The burden of proving that the corporate veil must be disregarded is on the party who attempts to negate the existence of the separate corporate entity. *Publicker, [Industries, Inc. v. Roman Ceramics Corp.,] supra,* 603 F.2d [1065,] at 1069 [(3d Cir.1979)]; and *Wheeling–Pittsburgh, supra,* 758 F.Supp. at 1058.

There is no evidence in this substantial record which could support a finding that any of the eight factors cited in *Main* support corporate veil-piercing here. Similarly, there is no evidence to support any conclusion that any particular provision of any of the contracts at issue should not be interpreted as written. Bell is a knowledgeable businessman who is presently and we therefore assume was at all relevant times represented by competent counsel.

■ The most important provisions of the contracts as written turn out to be, for purposes of this litigation, who are the parties to the contracts and the terms relating to the durations of the contracts. At the outset, we note that the SA is the last in the series of contracts and therefore supersedes and may modify those which preceded it. *See Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. America, etc.,* 544 F.2d 1207, 1213 (3d Cir.1976); *Reed, Fears & Miller v. Miller,* 2 F.2d 280, 282–83 (E.D.Pa.1924); *Levicoff v. Richard*

*I. Rubin Co.,* 413 Pa. 134, 141, 196 A.2d 359, 362 (1964); and *Thompson v. Craft,* 238 Pa. 125, 136, 85 A. 1107, 1111 (1913). As to the LOI, on which the Plaintiffs base their contentions that the relationship of the parties is that of a *de facto* joint venture, the SA conspicuously states as follows:

ARTICLE IV. *Termination of Letter of Intent.* The Letter of Intent and all performances required thereunder by the parties hereto or their respective affiliates is hereby terminated effective immediately and neither the parties nor their affiliates shall have any further rights, claims, obligations, or liabilities thereunder.

Therefore, no claims of any kind based on the LOI may be asserted by the Plaintiffs.

■ We also note that, to the extent that the Plaintiffs' claims are based on a violation of an implied duty of the Defendants to contract in good faith, such claims have no merit, for at least two reasons. First, we expressly find that the Defendants *have* acted in good faith in attempting to own and operate the brew pubs at issue in collaboration with RBBC. The failure of this venture was at best equally the fault of RBBC. We find that the Defendants have, after recognizing the futility of their continued collaboration with the Bell entities, engaged in reasonable efforts to extricate themselves from transactions in which they intended to perform, but which had gone sour, as they had a perfect right to do. Such efforts do not constitute evidence of contracting in bad faith.

■ Second, a financier's refusal to advance further funds in support of a business venture is not generally considered a violation of good faith. *See Temp–Way, supra,* 139 B.R. at 319–20. Also, the duty to contract in good faith, where it exists, cannot be utilized to modify or deny a creditor's legal rights. *Creeger Brick &*

*Bldg. Supply, Inc. v. Mid–State Bank & Trust Co.*, 385 Pa.Super. 30, 35–36, 560 A.2d 151, 154 (1989). The Defendants are therefore entitled to exercise their contractual rights, and refrain from making further investments in the futile venture with the Plaintiffs.

 The only parties to the LCA are RBBC and BP. Therefore, the LCA cannot serve as the basis for any claim by the Plaintiffs against the Debtor or GS. In one of its effects to invoke selected provisions of the SA in support of its claim, the Plaintiffs point out that the SA provides as follows:

> B. *License Fees.* GSC will cause Bella's Place to pay to Red Bell all license fees due and owing pursuant to the License Agreement through and including the Termination Date.

However, as the Defendants point out, "[i]t is fundamental contract law that one cannot be liable for a breach of contract unless one is a party to that contract." *Electron Energy Corp. v. Short*, 408 Pa.Super. 563, 567, 597 A.2d 175, 177 (1991). Thus, GS's status as the parent corporation of BP will not render it liable for BP's own undertakings under the LCA in the absence of a successful alter ego or veil-pursuing claim. In no event can the Plaintiffs assert claims against the Debtor in this case arising out of the LCA.

 As to the duration of the LCA, it provides as follows:

> E. *TERM OF AGREEMENT.* This Agreement commences on the date this Agreement is executed and expires in one year, as may be renewed in accordance with the terms and conditions set forth herein....

No further terms and conditions of the LCA extend the duration of the Agreement beyond one year.

These provisions can be contrasted with those of the MA addressing the same topic, which read as follows:

2.01 Term.

> This Agreement shall have an initial term of one year, commencing on the date first written above. Thereafter, this Agreement shall be automatically renewed for successive one-year terms for the duration of the time of the Lease, unless this Agreement is terminated pursuant to Section 2.02 below.

The LCA term provision thus does not include, as does that of the MA, any reference to the Site lease, nor does it provide for any sort of subsequent "automatic" renewal.

The SA expressly states that it does not change the provisions of the LCA regarding its termination, stating, as to the "Effective Date of Termination," that the LCA "will continue in accordance with its terms," adding, on that subject, only provisions regarding hiring and termination of managers which are not in contest at present. Therefore, the duration of the LCA remains at one year, renewable presumably only upon the continued agreement of the parties that it be renewed.

Whatever else might be said of the validity of the Letters to terminate the LCA prior to the end of its first year, see pages 862–864 *infra*, there is little doubt that the Letters express a desire of BP not to renew the LCA beyond its initial term of one year. We therefore conclude that the LCA expired at the close of May 19, 1999, of its own terms, irrespective of the validity of the BP's purported pre-expiration termination of it.

 The parties to the MA are the Debtor, BP, and GS. The Plaintiffs are not parties to it, nor has any person on their behalf, such as Bell, signed the MLA. There is absolutely no evidence that the Plaintiffs are rendered third-party beneficiaries thereto, as there is no expression in that contract to benefit them, nor is there proof of any circumstances compelling rec-

ognition of such a right. *See PNC Bank, Kentucky, Inc. v. Housing Mortgage Corp.*, 899 F.Supp. 1399, 1408 (W.D.Pa. 1994); *University Patents, Inc. v. Kligman*, 762 F.Supp. 1212, 1229 (E.D.Pa. 1991); and *Scarpitti v. Weborg*, 530 Pa. 366, 372–73, 609 A.2d 147, 150–51 (1992). Thus, it is apparent that the Plaintiffs have no rights against any of the Defendants under the MA.

We also reiterate that, in *RBGSC I*, 240 B.R. at 541–42, we held that the Debtor's motion to reject the MA was granted. While not deciding, at that time, the full effect of the rejection of the MA by the Debtor, we stated, *id.* at 542, that

> [w]hether rejection, contrary to what we found in [*In re Brown*, 211 B.R. 183, 189–91 (Bankr.E.D.Pa.), *rev'd in part & remanded*, 1997 WL 786994 (E.D.Pa. Nov. 26, 1997)], does in fact invalidate the MA is an issue which we do not decide at this time, although we would observe that this result may follow. *See Government Guarantee Fund of Republic of Finland v. Hyatt Corp.*, 95 F.3d 291, 300–07 (3d Cir.1996) (management contract constitutes an agency relationship which cannot be specifically enforced); *Brown II, supra,* and *In re Cloyd,* 238 B.R. 328, 334–35 (Bankr. E.D.Mich.1999).

■ We now hold, finding no authority to the contrary, that the Debtor's rejection of the MA does indeed terminate its obligations under the MA to any party because it cannot be specifically enforced against the Debtor. *See Hyatt Corp., supra.* The Plaintiffs' only rejoinder to *Hyatt Corp.* is citation of *Cottman Transmission Systems, Inc. v. Melody,* 851 F.Supp. 660 (E.D.Pa.1994), which allows an injunction in the quite distinct situation of pervasive trademark violations and refusals to abide by restrictive covenants in a franchise agreement. In any event, there is no basis on which to hold the Debtor or any other party liable to the Plaintiffs under the MA.

Furthermore, if management fees or incentive management fees could possibly be due to the Plaintiffs under the MA, we note that, since the Headhouse Site facility has never opened for business and has no sales, there are no gross sales nor net profits from such sales which could possibly serve as the basis of any claims for such fees.

Although the Plaintiffs apparently attempt to attribute the failure of the Headhouse Site facility to open for business to the Defendants, the parties appear to agree that the failure of the Defendants to procure a liquor license for the facility is the reason that it has not opened. The Defendants are clearly doing everything in their power to obtain this liquor license, including invoking the assistance of this court in their counterclaim against the Defendants, who are blocking their acquisition of the liquor license, in this Proceeding. Plumley testified without rebuttal that the liquor license application has been delayed because the LCB was uncertain who was entitled to occupy the Headhouse Site and because of the request of RBBC to hold all applications in abeyance pending resolution of that issue. We find, on the basis of this testimony, that the Plaintiffs are at least equally responsible with the Defendants for the failure of the liquor license application to be granted. As a result, they are at least in substantial part responsible for the failure of the Headhouse Site to open, and they have no equitable entitlement to any fees under the MA.

The foregoing discussion renders the resolution of whether BP was entitled to terminate the LCA and whether it validly did so through the medium of the Letters, while an issue which this court promised to decide, a relatively insignificant point. The term of the LCA expired on May 19,

1999, and was clearly not renewed by BP, per the contents of the Letters. The Letters purported to terminate the LCA just prior to the expiration of its term on May 3, 1999. Thus, the dispute regarding the validity of the BP's pre-expiration termination devolves into a determination of whether the Plaintiffs had a right to license fees under the LCA, which are claimed by the Plaintiffs to be no more then $5500/monthly, for a period of but seventeen (17) days.

■ In light of the very slight practical effect of this decision one way or the other, we are inclined to conclude that the Defendants have not met their burden of proving the Plaintiffs' insolvency and hence that they had valid grounds to support their attempted early termination of the LCA. The evidence is at least ambivalent as to whether RBBC was in fact insolvent, under any definition of the term, at the time of the attempted pre-expiration termination on principally that ground.

Furthermore, the LCA provides as follows regarding the grounds for termination of the LCA by BP:

A. *BY LICENSEE.* This Agreement may be terminated by the Licensee if:

(a) Licensor shall neglect or fail to perform any of its consulting duties and obligations hereunder or shall neglect or fail to observe any of the provisions of this Agreements and shall fail to remedy the same within 30 days after the Licensee shall have given the Licensor written notice specifying such neglect or failure;

(b) The Licensor shall

(i) admit in writing its inability to pay its debts generally as they become due;

(ii) make an assignment of all or a substantial part of its property of the benefit of creditors;

(iii) apply for or consent to or acquiesce in the appointment of a receiver, trustee or liquidator of the Licensee or of all or a substantial part of its property; or

(iv) file a voluntary petition in bankruptcy or a petition or an answer seeking reorganization under any bankruptcy or insolvency law or an arrangement with creditors, or take advantage of any insolvency law or file an answer admitting the material allegations of a petition filed against the Manager in bankruptcy, reorganization or insolvency proceedings; or

(d) [sic] The entry of a court order, judgment or decree without the application, approval or consent of the Licensor approving a petition seeking reorganization of the Licensor under any bankruptcy or insolvency law or appointing a receiver, trustee or liquidator of the Licensor or of all or a substantial part of its property, or adjudicating the Licensee as bankrupt or insolvent, and such order, judgment or decree shall not be vacated, set aside or stayed within 90 days after the date of entry.

This provision does *not*, contrary to the parties' apparent mutual assumptions, include "insolvency" in general as a ground for pre-expiration termination of the MA, but rather recites only neglect of duties which is not remedied thirty (30) days after notice as such a ground. As for insolvency-related grounds, the foregoing provisions require an assignment for creditors' benefit, appointment of a receiver or the like, or a voluntary bankruptcy filing, none of which has occurred, or for RBBC to "admit in writing" its inability to pay its debts, which it most certainly has not done.

The proof of RBBC's "neglect of duties" was as ambivalent as the evidence regarding RBBC's insolvency. All that was proven is that Bell is not an easy person with

which to deal. For all of these reasons, we hold that the Defendants have not proven a right to terminate the LCA prior to May 19, 1999, its expiration date. RBBC is therefore entitled to recover license fees, from BP only, through May 19, 1999.

We are not prepared to liquidate the precise amount due to RBBC by BP under the LCA, partially because we indicated that we would not do so at this time and partially because we could not do so because we are uncertain when the payments due to RBBC ceased or precisely what payments are due to it through May 19, 1999. We will schedule a hearing to ascertain this sum, as well as to hear the defamation claims and the remaining aspects of the interference with business relationships claims on January 26, 2000. We note that (1) the computation of these damages should be simple, (2) the defamation claims appear very weak, and (3) the interference with business relationship claims are in large part rejected in our discussion regarding the Defendants' good faith and reasonableness in their actions at pages 860–861 *supra* and at pages 864–865 *infra*.

The only other claim set forth in the Complaint which remains viable other than the defamation and interference with business relationship claims on which we will reserve decision is the claim for damages for breach of an oral contract to pay RBBC for Red Bell's wearable goods sold by BP at the Airport Site. Since BP is the sole manager of the Airport Site pursuant to the SA and the MLA, we deem it the only party liable on this claim. Although this claim appears modest, it cannot be liquidated on the basis of the current record and its liquidation must also be relegated to the January 26, 2000, hearing.

The Plaintiffs' claims for injunctive relief to enforce the LCA and the MA and to compel their specific performance must fail, due to the fact that the Plaintiffs have no enforceable rights of their own under the MA and have no rights under the LCA after its expiration on May 19, 1999.

Even if the Plaintiffs had present rights against the Defendants under either of these contracts, as we have expressly held that they do not, we do not believe that a mandatory injunction order specifically enforcing the contracts at issue would be in order. As the court held in *Cimina v. Bronich,* 517 Pa. 378, 383, 537 A.2d 1355, 1358 (1988),

> specific performance should only be granted where the facts clearly establish the plaintiff's right thereto, where adequate remedy at law does not exist, and where justice requires it. *Clark v. Pennsylvania State Police,* 496 Pa. 310, 436 A.2d 1383 (1981); *Roth v. Hartl,* 365 Pa. 428, 75 A.2d 583 (1950).

Thus, in *In re Pocono Springs Co.,* 1997 WL 347906, at *5–*7 (Bankr.E.D.Pa. June 18, 1997), we denied an injunction to specifically enforce a contract, even against a party which we found had willfully and intentionally breached a contract, thereby causing the plaintiff-debtor such great economic damage that they were forced into bankruptcy, because we found that injunctive relief would be disproportionally prejudicial to the defendant and other third parties.

In addition to the fact that the contracts have, respectively, expired and been terminated through rejection, thus eliminating the Plaintiffs' present rights therein, we find that it would be against public policy to attempt to compel these parties to continue in a relationship which both agree and have demonstrated to our complete satisfaction has deteriorated to the point where the parties can no longer effectively work together. Without attempting to assign fault for the deterioration of the parties' relationship, but finding that this was by no means due to unilateral wrongdoings on the part of the Defendants, as the

Plaintiffs suggest in their briefing, there is no question that this deterioration has reached the point where requiring the parties to work together would be futile. It would therefore be counterproductive to attempt to force the parties back into a containing relationship. In such circumstances, a breach of any contractual relationships might be deemed an efficient one for both parties, thus mitigating any damages due to the Plaintiffs. *See Paolella v. Browning–Ferris, Inc.,* 973 F.Supp. 508, 515 (E.D.Pa.1997), *aff'd,* 158 F.3d 183 (3d Cir.1998).

The best that the Plaintiffs can hope from this situation is an opportunity to buy out the interests of the Debtor in the brew pubs. They have that right under the terms of the Sale Motion. We also might add that the Debtor's willingness to sell out the interests in the Sites at little more than the investment made by GS is inconsistent with the Plaintiffs' thesis that the Defendants are attempting to push them out of their status as co-venturers to further capitalize on these opportunities themselves.

We are also unwilling at this time to order the injunctive relief sought by the Defendants against the Plaintiffs in their counterclaim, namely, an order preventing the Plaintiffs from interfering with the Debtor's liquor license application at the Headhouse Site. This decision has established the Debtor's continual right to own and operate the Headhouse Site facility, thereby resolving the primary question which the LCB required to be answered before it would consider the Debtor's application. This decision should therefore establish that the Debtor's application should not be held up at the behest of the Plaintiffs, as Plumley indicated that it has been to date.

Furthermore, the outcome of the Sale Motion may render the relief unnecessary, should the Plaintiffs successfully bid for the Headhouse Site or require that relief be tailored to the needs of a particular alternative purchaser. We will, however, keep the issue open by carrying the counterclaim issue to the date of the hearing on liquidation of damages and resolution of the claims set forth in the Complaint which are not decided herein on January 26, 2000.

## D. CONCLUSION

An order implementing the conclusions reached in this Opinion will be entered.

## ORDER

AND NOW, this 5th day of January, 2000, after conducting a trial of December 1, 1999, to supplement the record made in this removed proceeding ("the Proceeding") in the Philadelphia Court of the Common Pleas on July 28, July 20, August 4, and August 11, 1999, prior to its removal, and that made in prior hearings in this court on October 5, October 13, and October 20, 1999, on related matters in this case, it is hereby ORDERED and DECREED as follows:

1. It is DECLARED that the Plaintiffs are entitled to recover fees under the License and Consulting Agreement of May 20, 1998, through May 19, 1999; and under the oral agreement for receivables sold to date from Defendant BELLA'S PLACE, INC. ("BP") only.

2. All other claims made by the Plaintiffs in the first seven Counts of the Complaint filed in the Proceeding are DENIED and DISMISSED.

3. A hearing to consider (a) the precise damages due to the Plaintiffs on account of the claims referenced in paragraph one of this order; (b) the merits of the claims set forth in the eighth and ninth Counts of the Complaint; and (c) the necessity for relief on the Defendants' counterclaim against the Plaintiffs is scheduled on

WEDNESDAY, JANUARY 26, 2000, AT 9:30 A.M.

and shall be held in Bankruptcy Court-room No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107.